**ALTON**

**v.**

**ALTON**

No. 11,087

United States Court of Appeals

Third Circuit

Submitted June 18, 1953

Decided October 15, 1953

*See, also, 207 F.2d 667*

*Same case on certorari from Supreme Court of the United States, see 3 V.I.*

G. H. T. DUDLEY, Charlotte Amalie, St. Thomas, Virgin Islands, *for appellant*

MAAS and BAILEY, Charlotte Amalie, St. Thomas, Virgin Islands, *for appellee*

Before BIGGS, *Chief Judge*, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY, and HASTIE, *Circuit Judges*

GOODRICH, *Circuit Judge*

This case involves an important and novel question with regard to jurisdiction for divorce. The plaintiff, Sonia Alton, left her home in West Hartford, Connecticut, and went to the Virgin Islands, where she arrived

602

February 10, 1953. After six weeks and one day continuous presence there she filed a suit for divorce on March 25, 1953. Her husband, David Alton, defendant, entered an appearance and waived service of summons. He did not contest the allegations of the complaint. The commissioner to whom the case was referred filed findings of fact and conclusions of law and recommended that the plaintiff be granted a divorce for "incompatibility of temperament."[1] When the case came to the judge of the district court he asked for further proof on the question of domicile. This was not furnished. He thereupon denied the plaintiff the relief sought, and the case comes here on her appeal. The defendant has filed no brief and made no argument.

The core of our question is found in two acts of the Legislative Assembly of the Virgin Islands. The first is the Divorce Law of 1944, section 9 of which requires six weeks' residence in the Islands prior to commencement of a suit for divorce.[2] In Burch v. Burch [2 V.I. 559], 3 Cir. (1952), 195 F. 2d 799, this court construed the words "inhabitant" and "residence" in that statute to mean "domiciliary" and "domicile." In 1953 the Legislative Assembly passed another act which must be stated in full in order to understand the specific problem involved in this case. It amends section 9 of the Divorce Law of 1944 by adding to it an additional subsection (a) which reads:

"Notwithstanding the provisions of sections 8 and 9 hereof, if the plaintiff is within the district at the time of the filing of the complaint and has been continuously for six weeks immediately prior thereto, this shall be prima facie evidence of domicile, and where the defendant has been personally served

[1] This is one of eight grounds specified in the Divorce Law of the Virgin Islands, Act of the Legislative Assembly of the Virgin Islands approved December 29, 1944, § 7 [16 V.I.C. §. 104].

[2] Act of the Legislative Assembly of the Virgin Islands [Bill No. 14] approved December 29, 1944, § 9 [16 V.I.C. § 106. note].

within the district or enters a general appearance in the action, then the Court shall have jurisdiction of the action and of the parties thereto without further reference to domicile or to the place where the marriage was solemnized or the cause of action arose."[3]

■ The Legislative Assembly of the Virgin Islands has wide legislative authority. That authority, of course, comes from the Congress and is found in the organic act of the Islands. This power extends "to all subjects of local application not inconsistent with [other sections of this act] or the laws of the United States made applicable to said islands . . ."[4] Absent restrictions elsewhere, such a grant of power to a territory places it on a par with the States as to all matters properly included in the grant.[5]

■ ■ Certainly marriage and divorce are proper subjects of local legislation. So also is the jurisdiction of local courts. The organic act grants to the District Court of the Virgin Islands not only jurisdiction over annulment and divorce, but also jurisdiction over "all matters and proceedings not otherwise hereinabove provided . . . which may hereafter be placed within the jurisdiction of

[3]Bill No. 55, 17th Legislative Assembly of the Virgin Islands, passed May 19, 1953, approved May 29, 1953, amending § 9 of the Divorce Law of 1944 [16 V.I.C. § 106 note].

[4][1936 Organic Act of the Virgin Islands, § 19, prec. 1 V.I.C.], 48 U.S.C. § 1405r.

[5]Yerian v. Territory of Hawaii, 9 Cir. (1942), 130 F.2d 786, 789; Brodhead v. Borthwick, 9 Cir. (1949), 174 F.2d 21, certiorari denied (1949), 338 U.S. 847, 70 S. Ct. 87, 94 L. Ed. 518; Kitagawa v. Shipman, 9 Cir. (1931), 54 F.2d 313, certiorari denied (1932), 286 U.S. 543, 52 S. Ct. 496, 76 L. Ed. 1281; Lastra v. New York & Porto Rico S.S. Co., 1 Cir. (1924), 2 F.2d 812, appeal dismissed (1925), 269 U.S. 536, 46 S. Ct. 106, 70 L. Ed. 400; Gonzalez v. People of Porto Rico, 1 Cir. (1931), 51 F.2d 61; People of Puerto Rico v. Eastern Sugar Associates, 1 Cir. (1946), 156 F.2d 316, certiorari denied (1946), 329 U.S. 772, 67 S. Ct. 190, 91 L. Ed. 664.

The similarity of territories and states has also evoked the complementary principle that even though Congress may relieve the territories of restrictions that the Constitution imposes on the states, like the ban on burdening interstate commerce, only the clearest evidence of such intent will authorize the conclusion that it has done so. Mullaney v. Anderson (1952) 342 U.S. 415, 72 S. Ct. 428, 96 L. Ed. 458.

the District Court of the Virgin Islands . . . by local law."[6] We think this language, applied to divorce jurisdiction, puts the Virgin Islands on a par with the States, and overrides other restrictive provisions in Congressional legislation affecting the territories.[7]

Important as the Legislative Assembly's power is, however, it is like the law-making bodies of the States, subject to the limitations of the Constitution of the United States.[8] We approach the problem on review, therefore, as though the legislation in question had been passed by one of the States in this Circuit.

[6][1936 Organic Act of the Virgin Islands, § 28, prec. 1 V.I.C.], 48 U.S.C. § 1406 (4), (8).

[7]We do not think 48 U.S.C.. § 1471, prohibiting territorial passage of "special" divorce laws, or § 1463, granting territorial courts "common-law jurisdiction," have any application here. Nor do the judiciary regulations of Title 28 of the Code affect this case. See § 451 of that title, also 48 U.S.C. § 1405z and § 1406. See also I Moore's Federal Practice 51-66 (1938 ed.).

[8]The Constitutional limitations of the Fifth, Sixth, and Seventh Amendments [U. S. Const. prec. 1 V.I.C.] on the power of Congress to legislate, and consequently on the legislative power exercisable by territorial bodies created by Congress, apply ex proprio vigore in "incorporated" or "organized" territories that are part of the "United States." Rassmussen v. United States (1905) 197 U.S. 516, 25 S. Ct. 514, 49 L. Ed. 862. But, although it first seemed that these and similar limitations applied to all the territory over which the United States was sovereign, Dred Scott v. Sandford (1857) 19 How. 393, 15 L. Ed. 691, it seems to be settled that the entire Constitution does not extend of its own force to unincorporated areas. Dorr v. United States (1904) 195 U.S. 138, 24 S. Ct. 808, 49 L. Ed. 128 (no guarantee of trial by jury in the Philippine Islands); Balzac v. People of Porto Rico (1922) 258 U.S. 298, 42 S. Ct. 343, 66 L. Ed. 627 (no guarantee of trial by jury in Puerto Rico); Downes v. Bidwell (1901) 182 U.S. 244, 21 S. Ct. 770, 45 L. Ed. 1088 (no requirement that imposts be uniform in Puerto Rico). There have been from time to time, however, statements by the Supreme Court to the effect that there are certain "fundamental" rights protected by the Constitution which extend wherever the United States is sovereign. See Downes v. Bidwell, supra, 182 U.S. at pages 276-277, 21 S. Ct. 770, 45 L. Ed. 1088 (First Amendment; right to own property); Balzac v. People of Porto Rico, supra, 258 U.S. at pages 312-313, 42 S. Ct. 343, 66 S. Ct. [L. Ed.] 627 (Fifth Amendment); Dorr v. United States, supra, 195 U.S. at pages 146-147, 24 S. Ct. 808, 49 L. Ed. 128.

The Court of Appeals for the First Circuit has held the due process clause of the Fifth Amendment in effect in Puerto Rico by its own force. Arroyo v. Puerto Rico Transp. Authority (1947) 164 F.2d 748.

The Virgin Islands constitute an unincorporated territory. Soto v.

In connection with this 1953 act of the Virgin Islands, we must notice that it added an additional section 17 to the Divorce Law providing:

"Should any section of this law or part thereof be declared invalid by a Court of competent jurisdiction, said declaration shall not invalidate the remainder of this law." ▪

It is our obligation to separate the parts of the provision under consideration if we find one part of it is constitutional and the other part is not. Looking at the language to which our attention is addressed we think it pretty clear as a matter of construction of the English language that there are here two separable provisions. There are two rules provided and they are connected with a conjunctive "and." We think, therefore, that we must give attention to the two clauses independently.

We turn first to the opening clause of the statute. Continuous physical presence in the Islands for six weeks prior to the filing of a complaint in a divorce action is declared to be prima facie evidence of domicile. The question is whether such a declaration is within the legislative competence. The test to be applied is whether the fact or facts to be presumed are reasonably related or have some rational connection with the fact which creates the presumption. The leading case is Mobile, J. & K. C. R. Co. v. Turnipseed (1910) 219 U.S. 35, 31 S.

United States [1 V.I. 536], 3 Cir. (1921), 273 Fed. 628. This court, however, has held that the due process clause of. the Fifth Amendment extends to the Islands by its own force as a limitation on legislation enacted there. Soto v. United States, supra; Thornberg v. Jorgensen [1 V.I. 606], 3 Cir. (1932), 60 F.2d 471. While the Organic Act of the Virgin Islands which was enacted in 1936 [prec. 1 V.I.C.] did not extend the Constitution to the Islands (Cf. Alaska and Hawaii, 48 U.S.C. §§ 23, 495), it does contain a Bill of Rights which includes a due process and equal protection clause. [1936 Organic Act, §. 34, prec. 1 V.I.C.]. 48 U.S.C. § 1406g.

Ct. 136, 55 L. Ed. 78. It has been followed in many cases since.[9]

■ ■ The problem we must answer is whether six weeks' physical presence creates, without more, a rational foundation on which to base a finding of domicile. The requirements for effecting a change of domicile by a person having legal capacity are clear and undisputed. There must be physical presence in the place where domicile is claimed and there must be the intent to make that place the home of the person whose domicile is in question. Restatement, Conflict of Laws, § 15. If these two elements concur even for an instant the domicile is established at the new place.[10]

Physical presence is easy to prove. It is by far the easier element to establish in the question of change of domicile, and it is not conclusive one way or the other in answering the question of location of domicile. The books are full of cases where persons have been absent

[9]For presumption of negligence, see Seaboard Airline Ry. Co. v. Watson (1932) 287 U.S. 86, 53 S. Ct. 32, 77 L. Ed. 180; Atlantic Coast Line R. Co. v. Ford (1933) 287 U.S. 502, 53 S. Ct. 249, 77 L. Ed. 457; Hawkins v. Bleakly (1917) 243 U.S. 210, 37 S. Ct. 255, 61 L. Ed. 678; Easterling Lumber Co. v. Pierce (1914) 235 U.S. 380, 35 S. Ct. 133, 59 L. Ed. 279. Cf. Western & Atlantic Railroad v. Henderson (1929) 279 U.S. 639, 49 S. Ct. 445, 73 L. Ed. 884.

For presumptions of criminal or fraudulent intent or knowledge, see Adler v. Board of Education (1952) 342 U.S. 485, 72 S. Ct. 380, 96 L. Ed. 517; Morrison v. California (1934) 291 U.S. 82, 54 S. Ct. 281, 78 L. Ed. 664; Hawes v. State of Georgia (1922) 258 U.S. 1, 42 S.C. 204, 66 L. Ed. 431. Cf. Manley v. State of Georgia (1929) 279 U.S. 1, 49 S. Ct. 215, 73 L. Ed. 575.

For presumptions that findings of fact of a commission or board are correct, see, e.g., Meeker & Co. v. Lehigh Valley R.R. (1915) 236 U.S. 412, 35 S. Ct. 328, 59 L. Ed. 644.

See also Oyama v. State of California (1948) 332 U.S. 633, 68 S. Ct. 269, 92 L. Ed. 249; McFarland v. American Sugar Co. (1916) 241 U.S. 79, 36 S. Ct. 498, 60 L. Ed. 899; Bandini Co. v. Superior Court (1931) 284 U.S. 8, 52 S. Ct. 103, 76 L. Ed. 136; Republic Aviation Corp. v. N. L. R. B. (1945) 324 U.S. 793, 65 S. Ct. 982, 89 L. Ed. 1372.

[10]White v. Tennant (1888) 31 W. Va. 790, 8 S.E. 596.

from the place of domicile for a long time and still found not to have lost domicile there.[11]

The statute in question jumps the difficult phase in the proof of domicile, namely, the intent to make a home in the place where domicile is claimed. It would not be denied that long continued residence in a place tends to show that one has made a home there although there are many decisions in which courts have struggled with the problem even in the face of long continued presence in a place other than the one which at one time was the domicile of an individual concerned.[12]

A six-weeks' sojourn without proof of the intent with which one makes it, we think, tends to establish nothing but the fact of six weeks' physical presence. Thousands and thousands of people spend six weeks or more in a place every year on business, for pleasure, for reasons of health, to visit relatives and all the other different reasons which make Americans move about, without the faintest intention of making a change in their homes.

It is to be noted also that the statutory presumption in this case applies to the very thing on which jurisdition is founded. We think it is much easier to support a presumption or prima facie rule which allows a conclusion such as negligence to be drawn from named operative facts than it is to support a conclusion lifting a court into jurisdiction over that which it would not otherwise have.[13] Of course, it may be urged that in the

[11]Easterly v. Goodwin (1868) 35 Conn. 279 (several years); Culbertson v. Board of Com'rs. (1876) 52 Ind. 361 (27 Months); Sears v. City of Boston (1840) 1 Metc., Mass., 250 (16 months); Dupuy v. Wurtz (1873) 53 N.Y. 556 (9 years); In re Patience (1885) 29 Ch. Div. 976 (70 years); Winans v. Att'y Gen. (1904) A.C. 287 (54 years).

[12]Easterly v. Goodwin, supra; Dupuy v. Wurtz, supra; Udny v. Udny, L.R. 1 H.L. (Sc.) 441 (1869); In re Patience, supra; Winans v. Att'y Gen., supra.

[13]At least two Supreme Court cases have involved statutory presumptions of jurisdictional facts, rather than of other facts. The Court did not advert to the distinction in either opinion, but based its conclusions on the

first part of the statute this conclusion is not an irrevocable one and that the statute speaks in terms of "prima facie" only. But in considering all this we must open our eyes to the known facts about divorce litigation in this country. We know that while it is still conducted against a background of what appears to be ordinary contentious litigation in a great proportion of cases it is not this way at all. Thus, in the Virgin Islands for 1952 divorce litigation accounted for 343 cases concluded during that period; all other civil litigation amounted to only 272 cases. Of these divorce cases 342 were uncontested.[14] Back as far as 1932 surveys conducted by The Institute of Law of The Johns Hopkins University showed that in Maryland, a state with almost no migratory divorce problem, only 80 cases were actually contested out of the 2090 actions filed in 1929 and disposed of by May, 1931. 41.3% of these actions were technically contested by the filing of an answer. Marshall and May, I The Divorce Court 206-208 (1932). Statistics from the Bureau of the Census demonstrate the low rate of contested divorces in this country from 1887 to 1931:

| 1887 to 1906 | 1916 | 1922 | 1923 | 1924 | 1925 | 1926 | 1927 | 1928 | 1929 | 1930 | 1931 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Per Cent Contested 15.4 | 13.6 | 14.1 | 13.4 | 13.8 | 12.8 | 12.1 | 11.9 | 11.7 | 11.8 | 12.6 | 13.9 |

It should be noted that in many of these cases the only contest may have been the filing of an answer. Marriage and Divorce 30, 31 (1930); )Marriage and Divorce 25, 26 (1931). And see Note, The Administration of Divorce: A Philadelphia Study, 101 U. of Pa. L. Rev. 1204, 1208 (1953). More recent nation-wide compilations of

Turnipseed rule. Tot v. United States (1943) 319 U.S. 463, 63 S. Ct. 1241, 87 L. Ed. 1519; Yee Hem v. United States (1925) 268 U.S. 178, 45 S. Ct. 470, 69 L. Ed. 904.

[14] Appearances were filed in 296 of these uncontested cases; defendants were adjudged in default in 46 of them.

such statistics are not available. But several state reports reveal that the earlier figures are still representative: in 1951 only 7.8% of Iowa divorces and 11.4% of Nebraska divorces were even technically contested.[15] However, Florida contests have increased from 6.4% in 1930 to 34% in 1951.[16] This increase is probably the result of Sherrer v. Sherrer (1948) 334 U.S. 343, 68 S. Ct. 1087, 1097, 92 L. Ed. 1429, and Coe v. Coe (1948) 334 U.S. 378, 68 S. Ct. 1094, 92 L. Ed. 1451, under which it was established that the doctrine of res judicata was applicable when the defendant had appeared.

All this being so, and there is little doubt about the general facts with regard to divorce litigation, we think it bears upon the question of whether it is reasonable to call for an inference of domicile by a set of facts which leaves out the hard question, namely, intent, and purports to leave open to a nonexisting opponent the burden of disputing the conclusion which is otherwise to be drawn. If domicile is really the basis for a divorce jurisdiction, a subject considered later in this opinion, then six weeks' physical presence without more is not a reasonable way to prove it.

 In considering this statute we do not think that we can ignore the facts of life with respect to migratory divorce in America. It is well known to all of us that increasingly large numbers of persons who are dissatisfied with their marital lot are repairing to other jurisdictions, the Virgin Islands among them, where short residence requirements and liberal grounds for divorce appear to offer them the relief they desire. In very few of these instances do the parties intend to remain longer than necessary to obtain the decree sought. Consequently

[15]Percentages adduced from Ann. Rep. Iowa Div. Vital Statistics 98 (1951); Ann. Rep. Nebraska Bureau Vital Statistics 72 (1951).

[16]Percentages adduced from Marriage and Divorce 56 (1930); Florida Vital Statistics, Ann. Rep. Supp. I, 85 (1951).

in these cases the court's finding of domicile usually is contrary to the fact and frequently is based upon evasive or even perjured testimony. The statutory presumption in the present case will doubtless eliminate the temptation to such perjury but the findings based upon it will still be contrary to the true fact in the great majority of cases. The presumption must, therefore, be regarded as either an unreasonable interference by the legislative branch of the insular government with the exercise of the judicial power by the judicial branch or as an attempt by the legislature to convert the suit for divorce into what is in fact a transitory action masquerading under a fiction of domiciliary jurisdiction. We think that looked at in any of these ways the portion of the statute which provides for such a prima facie conclusion is invalid.

We pass, therefore, to the second part of the statute. The second part of the statute goes on to provide that the court shall have jurisdiction, after six weeks' residence by the plaintiff, where the defendant has been personally served or appeared, "without further reference to domicile." In other words, if the defendant is before the court, the case is to proceed without reference to domicile.[17] The action, in other words, is to become a simple transitory action like a suit for tort or breach of contract where, the defendant being in court and the court competent to proceed in this type of action, all the requisites for jurisdiction are satisfied. Can divorce be turned into a simple, transitory action at the will of any legislature?

[17]The legislative history of the statute shows without a doubt that the Legislative Assembly intended to confer jurisdiction to divorce regardless of domicile, rather than merely to establish a rule of evidence. In early 1953 a bill was passed making six weeks' residence the equivalent of domicile for divorce purposes. Bill No. 54, 17th Legislative Assembly of the Virgin Islands (2d Sess., 1953) [16 V.I.C. 106 note]. This bill was vetoed by the Governor, whereupon the statute before us was passed and signed.

█ The background of divorce legislation and litigation shows that it has not been considered a simple transitory personal action. The principle said to govern is that marriage is a matter of public concern, as well as a matter of interest to the parties involved. Because it is a matter of public concern, the public, through the state, has an interest both in its formation and in its dissolution, and the state which has that interest is the state of domicile, because that is where the party "dwelleth and hath his home."

The point is so fundamentally important here, that a quotation from Supreme Court language is called for. Mr. Justice Frankfurter, speaking for the Court, said:

"Under our system of law, judicial power to grant a divorce — jurisdiction, strictly speaking — is founded on domicil. Bell v. Bell, 181 U.S. 175; [21 S. Ct. 551, 45 L. Ed. 804]; Andrews v. Andrews, 188 U.S. 14 [23 S. Ct. 237, 47 L. Ed. 366.]. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance. The domicil of one spouse within a State gives power to that State, we have held, to dissolve a marriage wheresoever contracted. In view of Williams v. North Carolina, supra [325 U.S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577], the jurisdictional requirement of domicil is freed from confusing refinements about 'matrimonial domicil,' see Davis v. Davis, 305 U.S. 32, 41 [59 S. Ct. 3, 6, 83 L. Ed. 26], and the like. Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It also touches basic interests of society. Since divorce, like marriage, creates a new status, every consideration of policy makes it desirable that the effect should be the same wherever the question arises."[18]

18Williams v. North Carolina (II) (1945), 325 U.S. 226, 229-230, 65 S. Ct. 1092, 1095, 89 L. Ed. 1577. See also Restatement, Conflict of Laws, § 110, comment a; Goodrich, Conflict of Laws 396 (3d ed.).

So deeply has it been thought that the responsibility for divorce was that of the domicile, that divorce litigation has been called an action in rem, the res being the marital relationship between the parties.[19] One may question whether the analogy has not caused more confusion than clarity, but at any rate it shows the way in which the matter has been regarded in the law. It is of significance upon the importance of domicile as the foundation for jurisdiction that the Supreme Court has recently held that a divorce action at the domicile of one of the parties is entitled to full faith and credit as a matter of constitutional compulsion even without the presence of the defending spouse.[20] On the other hand, a divorce not at the domicile gives no protection against a prosecution for bigamy in the state of the domicile,[21] although if the defendant is in court he, himself, may be precluded from questioning the decree on the grounds of res judicata.[22]

We now go out beyond the place where legal trails end. The Supreme Court has never had occasion to say what would happen in a case where two parties, being personally before the court, are purportedly divorced by a state which has no domiciliary jurisdiction, and the question of the validity of the decree comes up in a second state in a prosecution for bigamy, or in a suit for necessaries by a creditor, or in some other such fashion. Granted that the parties are precluded from attacking the decree, does that immunity extend only to

[19]Haddock v. Haddock (1906) 201 U.S. 562, 576-578, 26 S. Ct. 525, 50 L. Ed. 865.

[20]Williams v. North Carolina (I) (1942), 317 U.S. 287, 63 S. Ct. 207, 87 L. Ed. 279.

[21]Williams v. North Carolina (II) (1945), 325 U.S. 226, 65 S. Ct. 1092, 89 L. Ed. 1577.

[22]Sherrer v. Sherrer (1948) 334 U.S. 343, 68 S. Ct. 1087, 1097, 92 L. Ed. 1429; Coe v. Coe (1948) 334 U.S. 378, 68 S. Ct. 1094, 92 L. Ed. 1451.

attacks by them or by those in privity with them?[23] Here is an unanswered question. The answer would be conclusive in this case if Mrs. Alton had got her divorce, had re-married, and had been prosecuted for adultery in Connecticut.

But assume that the Virgin Islands cannot grant to a nondomiciliary a decree which will be impregnable elsewhere by the shield of full faith and credit. Can it not, if it pleases, provide for the granting of a divorce decree to any plaintiff who has a defendant in court in the Virgin Islands? If the decree is good by the law of the Islands and the parties thereto and those in privity with them cannot attack it, it may well be good enough for practical purposes in a world where divorce decrees as well as everything else may fall short of perfection. But is such a decree, which the parties might regard as good enough, one which a nondomiciliary court may grant?

The Seventh Circuit has thought that there could be a divorce decree valid in the state where granted but invalid elsewhere.[24] Its judgment that Illinois must honor

[23]Following the Sherrer and Coe cases, supra note 22, the Supreme Court has held that if a person cannot collaterally attack the decree by the law of the state which rendered it, he cannot do so in the second state. Johnson v. Muelberger (1951) 340 U.S. 581, 71 S. Ct. 474, 95 L. Ed. 552. See also Cook v. Cook (1951) 342 U.S. 126, 72 S. Ct. 157, 96 L. Ed. 146.

In state courts it has been suggested that fraud on the court as to its jurisdiction permits a subsequent re-examination of jurisdiction by either party in a court of another state. Chirelstein v. Chirelstein (1950) 8 N.J. Super. 504, 73 A.2d 628, modified on other grounds (1951), 12 N.J. Super. 468, 79 A.2d 884; Staedler v. Staedler (1951) 6 N.J. 380, 78 A.2d 896. Cf. DuPont v. DuPont (Del. 1952), 90 A.2d 468, certiorari denied (1952), 344 U.S. 836, 73 S. Ct. 46 [97 L. Ed. 651], (fraud, other than respecting jurisdiction, not grounds for collateral attack).

Another version of estoppel prevents a subsequent attack for want of jurisdiction by the party who procured the decree. Under this version, nonparticipating spouses and even third parties have been barred from attacking jurisdiction in a second suit in another state. For extremes, see Harris v. Harris (1952) 90 U.S. App. D.C., 196 F.2d 46; Judkins v. Judkins (1952) 22 N.J. Super. 516, 92 A.2d 120. Cf. Ludwig v. Ludwig (1948) 413 Ill. 44, 107 N.E.2d 848.

[24]Sutton v. Leib, 7 Cir. (1951), 188 F.2d 766, 768. "We have searched the numerous cases decided by the Supreme Court of the United States on the

a Nevada marriage following a Nevada divorce, instead of a subsequent New York judgment invalidating the divorce and annulling the marriage for want of a Nevada domicile, was reversed by the Supreme Court.[25] That Court's decision was an application of the full faith and credit clause, which is not involved here at this stage of the proceedings. But if the opinion of the Seventh Circuit was directed at the validity of a divorce decree in the rendering state before subsequent proceedings call for the application of the full faith and credit clause, we are, with due deference, compelled to disagree.

Before the days of the Fourteenth Amendment, a state could and some states did, pass rules for the exercise of jurisdiction against nonconsenting, nonresident absentee defendants. These rules were not based upon what are now considered the fundamental requisites for such jurisdiction.[26] The judgments were not recognized in other states under the full faith and credit clause, but there was no foundation for testing their validity in the state where they were rendered.[27] After the Fourteenth Amendment provided a way for testing the validity of these

subject of migratory divorce for a definitive holding as to the judicial status of such divorce in the state that decreed it. It appears to be assumed that the decree is valid and binding in the state where it is rendered [citing]."

[25] Sutton v. Leib (1952) 342 U.S. 402, 72 S. Ct. 398, 96 L. Ed. 448. "The New York decree . . . is entitled to full faith throughout the Nation, in Nevada as well as in Illinois." 342 U.S. at 408, 72 S. Ct. at page 402, 96 L. Ed. 448.

[26] See Phelps & Others v. Brewer & Others (1852) 9 Cush., Mass., 390; Woodward v. Tremere (1828) 6 Pick., Mass., 354; Hall v. Williams (1828) 6 Pick., Mass., 232. See also Smith v. Colloty (1903) 69 N.J.L. 365, 55 Atl. 805.

[27] In D'Arcy v. Ketchum (1850) 11 How. 165, 13 L. Ed. 648, the Supreme Court construed the full faith and credit clause and the Act of 1790 enacted pursuant thereto not to alter the settled rule of international law previously existing. A judgment rendered in one state purporting to bind a citizen of another was not entitled to respect in the foreign state if the defendant had neither been served with process nor voluntarily appeared in the action. Thus a Louisiana court need not honor a New York judgment against a joint debtor not served in the New York suit, although

judgments in the rendering state under the due process clause, it became well settled that an attempt to give a personal judgment for money against one not subject to the state's jurisdiction was invalid at home under due process, as well as invalid abroad under full faith and credit.[28] With regard to this type of case one can generalize and say that due process at home and full faith and credit in another state are correlative.

The Restatement of Conflict of Laws says flatly that a state may not create an interest where it does not have jurisdiction.[29] Undoubtedly the result of a divorce decree is to affect interests in a matrimonial relationship. If it is still correct to say that the basis for divorce jurisdiction is domicile, a state where the party is not domiciled is, in rendering him a divorce, attempting to create an interest where it has no jurisdiction. Its attempt to do so is an invalid attempt, and contrary to the due process clause.[30]

there was no question of the validity of the judgment in New York under a statute of that state authorizing such judgment.

In Baker v. Baker, Eccles & Co. (1917) 242 U.S. 394, 37 S. Ct. 152, 61 L. Ed. 386, the Court reviewed the history of the full faith and credit clause and the developed rule that a judgment in personam in one state need not be credited in another without service of process on the defendant in the first action. "This rule became established long before the adoption of the 14th Amendment, as the result of applying fundamental principles of justice and the rules of international law as they existed among the states at the inception of the government." 242 U.S. at 401, 37 S. Ct. at page 155, 61 L. Ed. 386. "During the same period, however, it occasionally was intimated, if not held, by some of the state courts, that a personal judgment, effective within the territory of the state, could be rendered against a nonresident defendant who did not appear and submit himself to the jurisdiction . . . it is difficult to see how such a judgment could legitimately have force even within the state. But until the adoption of the 14th Amendment (1868) this remained a question of state law." 242 U.S. at 402-403, 37 S. Ct. at page 155, 61 L. Ed. 386.

[28]Baker v. Baker, Eccles & Co. (1917) 242 U.S. 394, 37 S. Ct. 152, 61 L. Ed. 386; Riverside and Dan River Cotton Mills v. Menefee (1915) 237 U.S. 189, 35 S. Ct. 579, 59 L. Ed. 910.

[29]Restatement, Conflict of Laws § 43.

[30]Because we are analogizing the Virgin Islands to a state, we refer to the Fourteenth Amendment. As pointed out in footnote 8, supra, however, the Islands are subject to the due process clause of the Fifth Amendment as well as to the due process clause in the Organic Act.

We think that the premise that divorce jurisdiction is founded on domicile is still the law. It was reiterated by the Supreme Court in unequivocal language in the quotation cited above, which language is the more significant because of the strong dissent expressed by Mr. Justice Rutledge. If that premise is to disappear in the light of real or supposed change in social concepts, its disappearance should be the result of the action of higher authority than ours.

The result suggested above is not spelled out in the books. If the Restatement generalization is correct the application necessarily follows. The Restatement generalization is demonstrably correct so far as a personal judgment for money is concerned. The arguable point here is whether in a world of changing mores jurisdiction for divorce based on domicile is as fundamental as the rule that you must have a defendant subject to your jurisdiction before you can give a personal judgment against him. Minority dictum from a member of the Supreme Court has indicated impatience with the domiciliary requirement.[31]

We think that adherence to the domiciliary requirement is necessary if our states are really to have control over the domestic relations of their citizens. The instant

[31]"I think a major operation is [necessary]. The Constitution does not mention domicil. Nowhere does it posit the powers of the states or the nation upon that amorphous, highly variable common-law conception. Judges have imported it. The importation, it should be clear by now, has failed in creating a workable constitutional criterion for this delicate region." Rutledge, J., dissenting in Williams v. North Carolina (11), supra, 325 U.S. at 255, 65 S. Ct. at 1107, 89 L. Ed. 1577.

"Domicil, as a substantive concept, steadily reflects neither a policy of permanence nor one of transiency. It rather reflects both inconstantly. The very name gives forth the idea of home with all its ancient associations of permanence. But 'home' in the modern world is often a trailer or a tourist camp . . . beyond this, 'home' in the domiciliary sense can be changed in the twinkling of an eye, the time it takes a man to make up his mind to remain where he is when he is away from home . . . Domicil thus combines the essential contradictory elements of permanence and instantaneous change." Id., 325 U.S. at pages 257-258, 65 S. Ct. at page 1107, 89 L. Ed. 1577.

case would be typical. In the Virgin Islands incompatibility of temperament constitutes grounds for divorce.[32] In Connecticut it does not.[33] We take it that it is all very well for the Virgin Islands to provide for whatever matrimonial regime it pleases for people who live there. But the same privilege should be afforded to those who control affairs in Connecticut.

■ ■ Our conclusion is that the second part of this statute conflicts with the due process clause of the Fifth Amendment and the Organic Act. Domestic relations are a matter of concern to the state where a person is domiciled. An attempt by another jurisdiction to affect the relation of a foreign domiciliary is unconstitutional even though both parties are in court and neither one raises the question. The question may well be asked as to what the lack of due process is. The defendant is not complaining. Nevertheless, if the jurisdiction for divorce continues to be based on domicile, as we think it does, we believe it to be lack of due process for one state to take to itself the readjustment of domestic relations between those domiciled elsewhere. The Supreme Court has in a number of cases used the due process clause to correct states which have passed beyond what that court has considered proper choice-of-law rules.[34]

[32]See Burch v. Burch [2 V.I. 559], 3 Cir. (1952), 195 F.2d 799, 806-807, in which this Court construed "incompatibility of temperament" to require "disharmony . . . so deep and intense as to be irremediable," not merely "those petty quarrels and minor bickerings which are but the evidence of that frailty which all humanity is heir to." The opinion of the district court in the case before us states that the plaintiff made out a case of incompatibility, and we are not asked to review this finding.

[33]Grounds for divorce in Connecticut are "Adultery; fraudulent contract; willful desertion for three years with total neglect of duty; seven years' absence . . .; habitual intemperance; intolerable cruelty; sentence to imprisonment for life or the commission of any infamous crime involving a violation of conjugal duty . . .; legal confinement, because of incurable mental illness, for at least five years . . ." Conn. Gen. Stat. § 7327 (1949).

[34]Hartford Accident & Indemnity Co. v. Delta & Pine Land Co. (1934) 292 U.S. 143, 54 S. Ct. 634, 78 L. Ed. 1178 (denial of due process for forum to apply its law that time limitation in insurance policy was invalid, when

■■ ■ If we are right so far in holding that the Virgin Islands have no jurisdiction to give divorces to persons not domiciled there, the second part of the statute quoted cannot aid the plaintiff's case. That part of the statute seems to say that if the parties are in court and do not object the court may not exercise its curiosity by finding out if there really is a domicile in the forum. It is well settled, of course, that parties cannot by their consent confer jurisdiction of the subject matter upon a court which does not have authority to deal with that subject matter. We have endeavored to show that the Virgin Islands do not have authority to deal with a marriage relation between nondomiciliaries. If that is right, forbidding a court to inquire whether a party is a non-domiciliary is a useless provision. Suppose a state statute purported to confer jurisdiction in matters concerning collision at sea upon a state court, in the absence of dissent by either party. Surely a conscientious state judge would not give any effect to the attempt by the legislature and the parties to take over what the Constitution assigns to another system of courts. The same is true here.

The judgment of the district court will be affirmed.

HASTIE, *Circuit Judge* (*dissenting*)

Prior to its recent amendment, which is here in controversy, the divorce statute of the Virgin Islands was silent as to the jurisdictional basis of divorce in that United States possession, except for a requirement that

policy issued in another state whose law permitted such provision); Home Ins. Co. v. Dick (1930) 281 U.S. 397, 50 S. Ct. 338, 74 L. Ed. 926 (denial of due process for forum to apply to an insurance policy issued in Mexico and containing a time limitation valid by Mexican law a statute of the forum invalidating such a provision). See also John Hancock Mut. Life Ins. Co. v. Yates (1936) 299 U.S. 178, 57 S. Ct. 129, 81 L. Ed. 106, and Order of United Commercial Travelers v. Wolfe (1947) 331 U.S. 586, 67 S. Ct. 1355, 91 L. Ed. 1687, basing similar conclusions in cases similar to the above on the full faith and credit clause.

one suing for divorce must show that he has resided in the territory six weeks and must give the defendant appropriate notice of the pendency of the suit. However, the system and the generally accepted rules of the common law obtain in the Virgin Islands, except as modified by statute. Accordingly, without benefit of any additional legislative definition of divorce jurisdiction, it was judicially declared by this court that in the Virgin Islands a divorce could be granted only to a party who was domiciled there. Burch v. Burch [2 V.I. 559], 3 Cir. (1952), 195 F.2d 799.

With the law in this state the legislative authority of the Virgin Islands in 1953 amended the divorce statute to change the preexisting situation in two ways. First, proof that the plaintiff in a divorce action has been continuously present in the Virgin Islands for six weeks is now made prima facie evidence of that party's domicil in the territory. Second, where personal jurisdiction has been obtained over both spouses the divorce power may be exercised in favor of a complaining spouse who has ·resided in the territory for six weeks, regardless of domicil. The result of this legislation is to establish alternative bases of divorce jurisdiction, the one predicated upon domicil without regard to personal jurisdiction over the defendant, and the other predicated upon personal jurisdiction over both spouses without regard to domicil. And, in either event, the legislature has deemed it appropriate to require six weeks' residence before the suitor's complaint shall be entertained.

The majority of the court think that both of these changes violate the Constitution of the United States. Dissenting, I think both changes are within legislative competency. They are of course quite different in their nature and effect and require separate analysis.

The first challenged amendment to the Virgin Islands divorce statute merely adds to preexisting law a provision that six weeks' continuous presence in the Virgin Islands shall constitute prima facie proof of domicil there. At the outset it is to be emphasized that this is not a substitution of a requirement of six weeks' presence for the requirement of domicil. Domicil remains the jurisdictional fact to be proved. Evidence is admissible to prove or disprove the plaintiff's domicil in the Virgin Islands exactly as it was before the statute was amended. The amendment merely shifts the burden of going forward with evidence if the hearing develops a certain situation; namely, that on the issue of domicil there is proof of six weeks continuous presence and no other evidence. The normal course of introduction of other evidence is in no way impeded. The defendant may present his own witnesses or cross-examine the plaintiff's witnesses. The court may exercise its normal prerogative of interrogating witnesses where their testimony is unclear or otherwise unsatisfactory. If, despite this full opportunity for rebuttal of the statutory presumption there is no refutation, then, and only then, must the court conclude that plaintiff has established his domicil in the territory. This is the total effect of the statutory provision now under consideration.

The court says that this evidentiary rule offends the due process clause of the Fifth Amendment. However, it recognizes that the only requirement of the Fifth Amendment in such a situation, as stated in Mobile, Jackson & Kansas City R. Co. v. Turnipseed (1910) 219 U.S. 35, 31 S. Ct. 136, 138, 55 L. Ed. 78, and frequently reiterated since then, is that there must be "some rational connection" between the proved fact and the presumed fact so that the inference of the existence of one

from the proof of the other is not "so unreasonable as to be a purely arbitrary mandate."

Up to this point I think we all are in agreement. Our divergence comes in the application of the Turnipseed doctrine. I think the most stringent rule that can be derived from the Turnipseed case and those that apply it — and many of the cases do not go this far[1] — is that the fact accorded the value of prima facie evidence have such relationship to the matter in issue as to be admissible in evidence as relevant and material to that issue. This does not mean that the proved fact standing alone need be enough to go to the jury on the matter in issue, absent the statutory rule. It means merely that without the statute the proved fact would be a normal and proper item in the total body of evidence introduced and effective to establish the ultimate fact.

Here the question is whether an individual has acquired a new domicil of choice. Ordinarily to establish the affirmative of that issue it would be necessary to show that the individual in question had come to the place of alleged new domicil and that his presence there was coupled with an intention to make that place his home for an indefinite period. Gallagher v. Philadelphia Transportation Co., 3 Cir. (1950), 185 F.2d 543. Of course proof of six weeks' presence standing alone would establish the physical element of domicil. And the fact that one has been continuously in the community for more than a month is one relevant fact which, in normal course without any statutory presumption, would properly be accepted, along with any and all other indicia of connection with and attachment to the community, as some objective manifestation of an intention to make more than a transient sojourn. It would be proof of behavior having

[1]Dean Wigmore cites many cases to support the view that a legislature has the broadest discretion in establishing these rules of *prima facie* evidence. See 4 Wigmore, Evidence § 1356 (3d ed.).

some probative value on the question of the state of mind. Thus it seems to me that the rational connection between six weeks' continuous presence and domicil is substantial and very clear. It proves one element of domicil and is relevant to the other. In these circumstances it is difficult to see upon what basis the statutory presumption can be attacked unless it is argued that domicil must in logic be inferable from six weeks' presence standing alone before the latter fact can by legislation be made prima facie evidence of the former. Apparently, this is the view of the majority. The difficulty with that position is that the Supreme Court seems to have settled the law the other way. The accepted doctrine was stated in Yee Hem v. United States (1925) 268 U.S. 178, 45 S. Ct. 470, 472, 69 L. Ed. 904, as follows: "If the effect of the legislative act is to give to the facts from which the presumption is drawn an artificial value to some extent, it is no more than happens in respect of a great variety of presumptions not resting upon statute." An examination of the cases shows that the Supreme Court and other courts have repeatedly approved statutes which, for the limited purpose of prima facie proof as herein defined, accord facts greater artificial probative value than is attributed to the proved fact by the present statute. Thus, membership in any organization on a state's subversive list may validly be made prima facie evidence that the individual himself advocates the overthrow of our government by force. Adler v. Board of Education (1952), 342 U.S. 485, 72 S. Ct. 380, 96 L. Ed. 517. A statute may make the fact that a naturalized citizen goes abroad to establish his home within five years after his acquisition of American citizenship prima facie evidence that he fraudulently misrepresented his intention to adhere to this country years earlier when he applied for citizenship. Luria v. United States (1913) 231 U.S. 9, 34 S. Ct.

623

10, 58 L. Ed. 101. Congress can validly provide that possession of narcotics without a package bearing a revenue stamp creates a rebuttable presumption that the possessor acquired them by purchase and not in a stamped package. Casey v. United States (1928) 276 U.S. 413, 48 S. Ct. 603, 72 L. Ed. 632. Under the statute approved in the Turnipseed case itself, the fact that a moving train damages a person or property, unless rebutted, requires a conclusion that the employees of the railroad were negligent. Under another rather familiar type of statute, if an automobile driven by a person not its owner is involved in a collision, the driver is to be regarded as the agent of the owner, unless evidence is adduced to the contrary. Koops v. Gregg (1943) 130 Conn. 185, 32 A.2d 653. Cf. People v. Kayne (1938) 286 Mich. 571, 282 N.W. 248. A statute may raise a presumption of fraud against a bank's officers and directors from the fact that the bank has become insolvent. Griffin v. State (1914) 142 Ga. 636, 83 S.E. 540, L.R.A. 1915C, 716. Even the commonplace presumption that motorists and pedestrians on today's highways use due care for their safety, however useful as a rule of evidence, is highly artificial if measured by common experience. If artificiality does not condemn all these rules and many others as well, I cannot see anything objectionable in the provision in suit.

The opinion of the court makes two additional points. One seems to be that this statute should be treated as if it embodied something different from the ordinary shifting of the burden of going forward with evidence because in so many jurisdictions, including the Virgin Islands, so few defendants elect to contest divorce actions. To me this circumstance is not relevant to the question of legislative power to make one fact prima facie evidence of another. I cannot see that the percentage of defendants who take advantage of the opportunity to rebut a

presumption affects the genuineness or the essential fairness of the opportunity the legislature has given all defendants to eliminate the presumption entirely by merely offering evidence on the ultimate issue. And that, in my judgment, is the important consideration here.

The other point urged by the majority is that because the issue of domicil goes to the jurisdiction of the court the fact from which domicil is presumed must be more strongly probative than a fact normally must be to become prima facie evidence of another fact. It is recognized that there is no authority for this proposition, but it is advanced by its proponents as an inherently reasonable distinction. However, it seems to me that the answer to the critical question whether it is arbitrary and unfair to create a presumptive relationship between a period of presence and domicil is in logic the same whether in a given case the purpose of proving domicil is to determine the inheritance of personal property, or voting rights, or entitlement to poor relief, or the existence of divorce jurisdiction, or any other issue in a lawsuit. Indeed, from the point of view of a defendant I think it is more likely to be harmful to use a statutory presumption to establish the merits of a claim against him than to determine whether one professionally competent tribunal or another is to hear the suit.

This brings me to my last point on this provision of the statute. Whom does the questioned rule of evidence deprive of anything without due process of law? The Fifth Amendment says "No person shall be" denied the essentials of fair procedure. But the present rule deprives no defendant of a fair and full opportunity to challenge the domiciliary claims of the plaintiff and the jurisdiction of the court. In contrast it is instructive to consider how much harsher and more drastic than this provision is the legislation approved as consistent with due process by the Supreme Court

in York v. State of Texas, 1890, 137 U.S. 15, 11 S. Ct. 9, 34 L. Ed. 604, under which a defendant could not even appear to challenge the jurisdiction of a court without submitting fully to its attempted assertion of power.

Also relevant to the problem of finding whose rights this statute invades is the fact that the present defendant has not even questioned the validity of the Virgin Islands rule of prima facie evidence. This is something the courts are doing on their own initiative.

## II

In striking down the second amendment of the statute, which provides for divorce where both parties are subject to the jurisdiction of the insular possession and its courts, this court now says that the Fifth Amendment requires that the exercise of legal power to grant divorce be restricted to those cases where one party at least is a local domiciliary. The agreed starting point in this phase of the case is the fact that English and American judges in recent times have refrained, in the absence of statute, from exercising their divorce power except in cases involving local domiciliaries. But what is it that raises this judicial rule of self-restraint to the status of an invariable Constitutional principle? What makes any legislative effort to establish an alternative basis upon which state power may be exercised in divorce cases a violation of due process of law?

I can find nothing in the history of the present judge-made rule which entitles it to Constitutional sanction. Certainly it is no ancient landmark of the common law. I do not know of any evidence that such a concept even existed in the jurisprudence of 18th century England or that it could even possibly have been a part of the conception of procedural due process at the time our Constitution was adopted.

The common law courts in England had no divorce jurisdiction at the time of the American Revolution and I know of none which was exercised by the courts in the North American British colonies. The English ecclesiastical courts could grant a form of relief analogous to our present separation from bed and board. And Parliament could legislate an absolute divorce, presumably for any subject to the King wherever he might make his home. But it was not until 1857 that the common law courts in England were for the first time given authority to entertain divorce causes. See 20 and 21 Vict. c. 85.

In the United States our Constitutional scheme placed this power among those relegated to the several states. They began exercising it through their courts in the early days of the nation. A contemporary scholar has suggested, and I have seen no contrary evidence or suggestion, that it was Story, in the 1834 publication of the first edition of his Commentaries on the Conflict of Laws, who first gave currency to and soon won rather general judicial acceptance for the theory that matters of divorce should be left to the place where the spouses made their home. Cook, Is Haddock v. Haddock Overruled, 1943, 18 Ind. L.J. 165. Perhaps this is an oversimplification of history. However, it does seem clear that the rule that divorce jurisdiction will be exercised only by the courts of a state which has a domiciliary connection with the spouses is a creation of nineteenth century American judges. It is also clear that the rule did not become settled in England, the normal source of common law tradition, until the 1895 decision of the Privy Council in Le Mesurier v. Le Mesurier, [1895] A.C. 517. Thus, we seem to have the curious chronology of the American courts adopting a rule of practice in the first half of the nineteenth century under the influence of the creative scholarship of a distinguished writer, the British courts adopting this doctrine in the latter half of the

627

nineteenth century, and now in mid-twentieth century, American judges saying that the doctrine is one of those fundamental ideas which must be read into the original provisions of our Constitution. My conclusion is that, on such evidence as is at hand, the limitation of the divorce power to the domiciliary state has no such ancient roots or impressive history as to suggest its entitlement to perpetuation as a Constitutional requirement.

I do not mean to suggest that prerevolutionary existence is essential to Constitutional protection of a doctrine. But it does seem to me that when a rule is one of self-limitation which judges have imposed upon themselves in relatively recent times we should not treat it as a Constitutional requirement unless it is very plain that a proposed legislative change would result in a fundamentally arbitrary and unfair way of dealing with men in modern society. Accordingly, I think our real question on this phase of the case is whether it is clearly arbitrary or unfair for a legislature to adopt an alternative for domicil as an appropriate foundation for divorce power.

When I get to this point I am impressed that a number of states in the British Commonwealth have by legislation made domicil unnecessary to divorce jurisdiction in various situations. See Griswold, Divorce Jurisdiction and Recognition of Divorce Decrees — A Comparative Study, 1951, 65 Harv. L. Rev. 193, 197–208. I find it difficult to see in what respect these abandonments of domicil as a fundamental basis of divorce are patently unfair and arbitrary, even though a particular legislature may not have been restrained by a written Constitution.

I have also found it helpful in judging whether the domiciliary rule is a Constitutional necessity to reread some of the judicial discussion before our judicial forbears, through much restatement by themselves, had come to regard this rule as something fundamental in the legal

order. I find particularly interesting the discussion of the Lord Justices in Niboyet v. Niboyet, 1878, L.R. 4 P.D. 1. The Justices there debated the merits and demerits of the domicil rule against a wider rule which would extend jurisdiction to persons living for the time being in England but domiciled in France. The reading of such a judicial discussion leaves one rather confident that there is nothing in the essential nature of civilized procedure or even inherent in the common law viewpoint which makes the domicil rule a must.

I think the soundness of this view is but emphasized if one contests the majority's position on the ground of its own choosing. The court reasons this way: "Because it [marriage] is a matter of public concern, the public, through the state, has an interest both in its formation and in its dissolution, and the state which has that interest is the state of domicile, because that is where the party 'dwelleth and hath his home' ". Accordingly, the court concludes "that adherence to the domiciliary requirement is necessary if our states are really to have control over the domestic relations of their citizens", and that any departure from the domiciliary rule would be a denial of procedural due process. This statement of social justification of a legal rule presupposes a stable and intimate attachment of both spouses to a single community which in fact and alone has a genuine interest in their relationship.[2] But this picture is no longer characteristic of our society or of the conduct of estranged spouses in it. In their activities and their careers men are increasingly mobile. Community attachments tend to be less intimate and less lasting than heretofore. And when the unsettling factor of do-

[2]For such a situation, see the setting of the controversy in Williams v. State of North Carolina, supra, as vividly outlined in Powell, And Repent at Leisure, an Inquiry into the Unhappy Lot of Those Whom Nevada Hath Joined Together and North Carolina Hath Put Asunder (1945), 58 Harv. L. Rev. 930, 932-933, notes 6 and 7.

mestic estrangement is added there is considerable likelihood that the spouses will go their separate ways. in different communities. One need not approve these patterns of behavior to recognize what doubt they cast upon the essentiality of a legal rule which must be justified by premising a single community which alone and intimately is concerned with each unsuccessful marriage.

Actually, the concept of domicil as a basis of jurisdiction is in practice elusive and very unsatisfactory for several reasons. It is a highly technical concept depending upon the proof of the mental attitude of a person toward a place. Whether in taxation or in divorce, the use of domicil as a jurisdictional base gives trouble when it is applied to people who really have no "home feeling" toward any place or, at the other end of the scale, to those who have more than one home. And, as already pointed out, in the divorce field difficulties are multiplied because the estranged spouses so often establish separate homes. Thus, when a court is asked to grant a divorce it very often finds that not one domicil but at least two — potentially more through refinements of the "marital domicil" concept — may be interested in the parties and their relationship. In these all too familiar situations of divided domicil, the jurisdictional requirement which the majority regards as so essential to fairness that it can not be changed is a troublemaker and a potential source of injustice.

In this very case, suppose Mrs. Alton had proved to the satisfaction of the majority of this court that her six weeks stay in the Virgin Islands had been attended by the intention to remain there permanently, while Mr. Alton continued a domiciliary of Connecticut. Under the rule of the power of the domicil of one spouse as settled in Williams v. State of North Carolina, 1942, 317 U.S. 287, 63 S. Ct. 207, 87 L. Ed. 279, overruling Haddock v. Haddock, 1906, 201 U.S. 562, 26 S. Ct. 525, 50 L. Ed. 867, it is clear that the

Virgin Islands would have plenary divorce power in this situation. But what of the interest of Connecticut, the home of the husband, the place of marriage, and the last matrimonial domicil, which must be very important under the rationalization offered to justify the domiciliary rule? Or consider the facts in Maynard v. Hill, 1887, 125 U.S. 190, 8 S. Ct. 723, 31 L. Ed. 654, where the Territory of Oregon granted a legislative divorce to a man who had left his family in the east, promising to send for them when he became settled in the west, but instead persuaded a friendly territorial legislature in his new home to grant him a divorce. The domiciliary rule says that Oregon had jurisdiction to divorce the parties. In all such cases as these the domiciliary rule permits the public interest and concern of the defendant's domicil as well as his personal interest to be ignored entirely if it can only be shown that the complaining spouse really intends to live in the place where suit is filed.

At this stage it seems to me that a reasonable person can say that the domiciliary rule does not accomplish what its proponents, including the majority here, claim for it. If it is socially justified in some circumstances, it works unfairly without social justification in others. Perhaps the trouble is that it exaggerates the theoretical interest of the technical domicil of a plaintiff at the time of suit for divorce at the expense of personal and community interests on the defendant's side.

When the merits and demerits of the rule of domiciliary jurisdiction are thus weighed, one person may conclude that it still works well enough in a large enough number of cases to deserve retention. But that permissible conclusion cannot be a requirement of justice or logic. There is room for difference of judgment.

In the Virgin Islands it has seemed to the legislature that an alternative to the domiciliary rule is worth a trial.

And in selecting the alternative of personal jurisdiction over both parties, the legislature has obviated that very disregard of interests on the defendant's side which is the great weakness of the domiciliary rule. In this section I can find nothing arbitrary or unfair; hence, nothing inconsistent with the Fifth Amendment.

One other matter should be mentioned. Although the court recognizes that, as concerns authoritative precedents, this case requires us to travel beyond the place "where legal trails end", the majority opinion places some reliance upon the less than pellucid body of case law which is concerned with various aspects of the problem of recognition of divorce granted in one state of the union by a sister state. For present purposes I do not find these cases very helpful. The due process question in divorce jurisdiction which we have to decide is whether it is fair for a state and its courts to adjudicate the merits of a petition for the dissolution of a particular marriage. The problem of the full faith and credit cases is to what extent a second state must subordinate its notions of policy about a marital matter in which it wants to have a voice to what a sister state has already decided. Perhaps full faith should be given to every American divorce decree which satisfies due process. But until the Supreme Court makes it clear that in this area due process and full faith are of the same dimensions, I mistrust any inversion of reasoning which would extract from the not invariant line of decisions on full faith and credit the essentials of due process in the original exercise of divorce power.

### III

Although for the reasons already stated I believe both of the questioned provisions of the Virgin Islands divorce statute are valid, they may differ in their bearing upon the proper disposition of a suit.

In all of the proceedings in this case prior to decision by this court the litigation has been treated as if it involved only the problem of adequate prima facie proof of domicil, and not the alternative possibility of maintaining the suit regardless of domicil. Thus, when the matter came before the district court on motion to confirm findings of the commissioner who had sat as a master, there was this colloquy between the court and counsel:

"The Court: I have looked at the Transcript of the Record herein and I would like to ask whether you have any more evidence to offer on the question of domicile.

"Mr. Dudley: No, sir.

"The Court: It is my opinion, after examining the record, that the proof herein is not sufficient to establish domicile in accordance with the directive in the case of Burch v. Burch, decided by the Court of Appeals of this Circuit.

"Mr. Dudley: If your Honor please, our divorce law has been amended as of May 29, 1953, and there is a new section 9a now in effect which makes six weeks residence on the part of the plaintiff prior to the filing of the complaint prima facie evidence of domicile.

* * *

"The Court: I have seen the new section and, as I said before, I doubt whether it is sufficient to confer jurisdiction, and I will have to deny your motion. The motion will therefore be denied and the complaint will be dismissed."

In this court the appellant has urged only that the ruling based upon the above quoted colloquy was incorrect. Since the plaintiff has thus tried to prove domicil and contends that she succeeded, I think there should be a reversal on the ground that she did prove domicil in the manner provided by a valid statute.

But because the majority, disapproving this rule of prima facie evidence, found it necessary also to consider the second provision of the statute, I have thought it appropriate to set out my reasons for believing that the due process clause does not prevent the entertaining and ad-

judicating of a divorce action in any American state or territory which has personal jurisdiction over both spouses. However, it seems proper to point out that if a state proceeds upon this new basis of divorce jurisdiction another conflict of laws difficulty must be faced before the merits of the claim can be decided. That difficulty is the proper choice of the law to govern the controversy.

So long as one of the spouses has had a domiciliary relationship to the forum it has been conventional theory that the forum has sufficient connection with the domestic relation which is the subject matter of suit to justify not only the exercise of its judicial power to decide the controversy but also the application of its own substantive law of divorce as well. Stewart v. Stewart, 1919, 32 Idaho 180, 180 Pac. 165. It is quite possible that some of the difficulties which have arisen in this field are the result of failure to keep in view that these are distinct problems although the existence of a domiciliary relationship is thought to solve both.

But once the power to decide the case is based merely upon personal jurisdiction a court must decide as a separate question upon what basis, if any, the local substantive law of divorce can properly be applied to determine whether the plaintiff is entitled to the relief sought. In this case, if it should appear that Mr. and Mrs. Alton were both domiciled in Connecticut at the time of suit in the Virgin Islands and that their estrangement had resulted from conduct in the matrimonial home state, it may well be that under correct application of conflict of laws doctrine, and even under the due process clause, it is encumbent upon the Virgin Islands, lacking connection with the subject matter, to apply the divorce law of some state that has such connection, here Connecticut. Cf. Hartford Accident & Indemnity Co. v. Delta & Pine Land Co., 1934, 292 U.S.

143, 54 S. Ct. 634, 78 L. Ed. 1178; Home Ins. Co. v. Dick, 1930, 281 U.S. 397, 50 S. Ct. 338, 74 L. Ed. 926.

Of course such a solution would be a novelty in divorce procedure. But the entire situation presented by this statute is very unusual. And the legislation is an innovation in a very important area. I think, therefore, that we should try to answer no more questions than the exigencies of this litigation require. I am specially reluctant to express any judgment on a point which was not considered below and was not briefed before us. Accordingly, I do no more than point out that this choice of law question would have to be considered if the court's power to decide this case depended upon personal jurisdiction and that basis of jurisdiction were sustained, as I believe it should be.

As this case actually stands before us, I think we need and should do no more than to reverse on the issue that was actually contested in the district court.

I am authorized to state that Chief Judge BIGGS and Circuit Judge KALODNER concur in the views stated in this opinion.