DORIS LAMB, Appellant, *v.* FRANK B. LAMB,
RESPONDENT.

No. 3161

March 5, 1937.                    65 P. (2d) 872.

*William M. Kearney,* for Appellant:

*Ayres, Gardiner & Pike* and *George L. Sanford,* for Respondent:

## OPINION

By the Court, TABER, J.:

This case comes here on appeal from a judgment of the First judicial district court, Ormsby County, and from an order of that court denying a motion for a new trial. The action is one for a divorce, and respondent, plaintiff in the trial court, was granted a decree on the ground of extreme cruelty. Except for two allegedly erroneous instructions given to the jury, and which will be referred to later, this appeal is based on the contention that plaintiff's alleged residence in Nevada was not in good faith, but, on the contrary, was for the sole purpose of procuring a divorce. Plaintiff's conduct with regard to establishing an alleged residence in Nevada was, appellant claims, a fraud not only on her but on the court as well. Respondent insists that his residence in Nevada was bona fide; that when he first came to Nevada it was his intention to make his home here; and that such intent remained the same at all times thereafter.

Plaintiff and respondent intermarried in 1927 at Pittsfield, Mass., and thereafter resided at Norwich, Conn., until they came west in the summer of 1933, at which time plaintiff claims he became a resident of Nevada. Defendant's trip west was a needed vacation, and she went to Long Beach, Calif., to visit relatives. Soon after she reached there plaintiff arrived from Norwich, on August 6, and then one of her relatives drove her, plaintiff, and their small child to Zephyr Cove, a summer camp in Douglas County, Nevada, on the shore of Lake Tahoe. After a few weeks there, defendant returned to Norwich. Shortly thereafter plaintiff also went to Norwich, whence, after remaining but one day, he returned to Nevada, and commenced this action for divorce on October 27, 1933.

We shall now give a brief summary of the testimony upon which appellant mainly relies in support of her position that plaintiff's alleged residence was not in

good faith, and that the trial court was therefore without jurisdiction.

Mrs. Gloria B. Wiley, called by plaintiff, testified that plaintiff and defendant arrived at Zephyr Cove about August 8, 1933, having been driven there by a gentleman who had previously been there and "evidently recommended the place to them"; that Zephyr Cove is a camp for summer tourists, and is closed in winter; that plaintiff and defendant engaged a cottage for one month; that witness saw plaintiff practically every day, but that she did not believe it was for the full month; that plaintiff and defendant did not have a car when they first came, but shortly afterwards plaintiff went to Carson or Reno and brought back a Ford; that later he had another car.

H. A. Peigh, called by plaintiff, testified that he saw plaintiff daily between August 8 and September 9, 1933; that he and plaintiff were absent one day, about September 4, at Lodi and San Francisco; that after September 9 plaintiff went east, returning on September 28; that from September 28 until October 12 witness and plaintiff lived at the Frandsen Apartments in Reno, moving thence to an apartment at Bradley's in Carson City, where they lived a week, then moving again to Mrs. Sam Davis' house in Carson City, where they lived from October 19, 1933, to February 1, 1934.

Plaintiff, in his own behalf, testified that he first came to Nevada August 4, 1933; that he stayed one day at Reno, where he procured from an attorney a blank power of attorney which he took with him to Long Beach for defendant to execute, as he understood that she would give him a divorce without any contest; that defendant refused to execute the power of attorney; that plaintiff still owned the home where he and defendant lived at Norwich, and a building lot near a lake in Connecticut on which he had built a small house; that while at Long Beach he talked things over with defendant; that he wanted to get a divorce at that time; that he did not care to go on under existing conditions; that

he could not go home; that the cottage at Zephyr Cove was hired for a month, as he recalled; that at that time he was more or less run down, tired, his nerves were on edge, and he could not do much of any work unless it was laboring; that he decided they would rest there for a month or so, and then he would look for work and they would "settle down out here somewhere"; that after returning from his trip to Norwich he went to the Girl Scout Camp at Zephyr Cove and worked around there, cleaning the place up, two or three days; that during this time he usually ran back into Reno each day, and stayed in Reno more than he did at Lake Tahoe.

C. F. Wiley, called by defendant, testified that when the cottage was rented plaintiff said he would rent it for a month, and that he and his family would be there about two weeks longer; that defendant left in about three weeks, and that about a week after she left plaintiff also left and "we didn't see him for somewhere around a week."

Mrs. Gloria B. Wiley, called by defendant, testified that she operated the summer camp at Zephyr Cove; that after defendant left the camp, plaintiff returned to Zephyr Cove with a Pontiac sedan before leaving for the east; that after leaving her camp for the east, plaintiff did not again take up his abode there, but that about a month after leaving he returned and lived nearby at the Y. W. C. A. camp for awhile, keeping house there with Mr. Peigh; that plaintiff did not make any inquiries of witness regarding defendant after she left; that while plaintiff was at the Y. W. C. A. camp he was not, to her knowledge, doing anything except keeping house with Mr. Peigh.

Defendant, in her own behalf, testified that she did not anticipate plaintiff's arrival at Long Beach on August 6, 1933; that he had written her a letter from New London, Conn., informing her that he was going to leave there at some later date—she did not know when; that some time before she left for the west plaintiff had told her he wanted to be alone that summer and

think things over; that he was gone for five weeks before she came west, and she did not know whether he was alive or dead "or what," and she worried herself sick and felt she needed a vacation; that her husband bought the round trip ticket for her, the return limit on which she believed would be up in October; that she refused to execute the power of attorney at Long Beach; that plaintiff suggested the trip to Lake Tahoe; that defendant did not know they were coming to Nevada; that plaintiff said they were just going to stay for awhile; that after they arrived at Mr. and Mrs. Wiley's summer camp at Zephyr Cove, plaintiff told her they were in Nevada, and a few days after their arrival he requested defendant to go to Reno to see an attorney about getting a divorce—the same attorney from whom plaintiff had procured the power of attorney; that she told plaintiff she did not want a divorce—that she loved him; that they were enjoying their vacation, except for plaintiff's continued efforts to persuade her to go and see the Reno attorney and have him get a divorce for her—plaintiff being willing to pay the expenses; that finally he told her that if she would not go and see the attorney he would do so himself, and would start action against her; that she finally went to see Mr. Kearney, and on the advice of counsel left Lake Tahoe and went back to her home at Norwich, where she continued to live; that before going to Zephyr Cove plaintiff told her he had been in Nevada; that her trip to Lake Tahoe was for the purpose of a vacation.

We now briefly review the testimony upon which plaintiff rests his contention that his residence was bona fide.

The testimony of H. A. Peigh has already been referred to.

C. L. Morrison testified that plaintiff resided in Carson City, at Bradley's and Davis', "all winter" from and after October 12, 1933.

Mrs. Gloria B. Wiley, hereinbefore mentioned, testified

that defendant, before leaving Zephyr Cove, was inquiring about any one going east who would drive her car; that witness assumed plaintiff was remaining.

In his own behalf, plaintiff testified that when he arrived at Zephyr Cove on August 8 he had the intention of making Nevada his home; that he still had that intention; that he was engaged in the business of renting saddle horses, with C. L. Pate—also selling cars occasionally; that at the time he filed his complaint in this action he still retained the intention of making Nevada his home, and that he had had that intention ever since he came to Nevada on August 8; that when he left Nevada in September to make the trip to Norwich he still had that intention; that he had two reasons for making the trip to Norwich, namely, he wanted to see where his wife and child had gone, and he wanted to see his father and mother; that when he left Nevada to make the trip to Norwich, he intended to return to Nevada and had made arrangements to return when he left; that he stayed at Norwich one day, and then returned to Nevada; that his trip to Lodi was for the purpose of ascertaining the whereabouts of defendant; that he drove to Nevada in August 1933, in a Pontiac sedan and left it at Scott Motors Company in Reno to be sold, and then bought a second-hand Ford at Virginia City which he used at Zephyr Cove; that he told defendant he had the Pontiac car for sale in Reno, and was going to use the proceeds of the sale "to get established out here"; that he later got the Pontiac from Scott Motors after defendant left Zephyr Cove, and drove it on his trip to Norwich; that the house in which he and defendant had lived at Norwich had a $9,200 mortgage against it, also an attachment, and that the best offer he could get for this property, when he tried to sell it in the latter part of 1932 or 1933, was $8,000; that with reference to the building lot and small house on the shore of a small lake in Connecticut, he traded a second-hand rifle for the lot, and had not paid for the lumber in the house, which cost about eighty or ninety dollars;

that when defendant returned to Norwich he did not give up any previous idea he had of remaining "out here"; that when he went to Long Beach he discussed the matter of a divorce with defendant; that he wanted to get a divorce at that time—did not care to go on under conditions; that he could not go home, had to go some other place and start; that he knew he could not work there under conditions, and he told defendant he was coming "out here" to live; that he wanted a divorce, but defendant did not want him to have a divorce at that time and suggested they start over and try to make a go of it "out here"; that he believes it was Mr. Bordeaux, who was married to defendant's cousin, who suggested that they go to Zephyr Cove; that plaintiff agreed to try it again and see if they could not get along some way for the sake of the child, and Mr. Bordeaux then drove them up in his car; that for the first week after arriving at Zephyr Cove they got along fine, but then defendant started going to the store, and down on the beach, and different places, and plaintiff was not feeling very well and stayed at the cottage most of the time, doing more or less of the housework at that time; that he did the washing, the ironing, and some of the cooking; that one morning in August he and Mr. Peigh came down to Carson to get some cartridges for a gun, and he asked defendant if she wanted to come, and she said no; that while in Carson that day he saw her on the street; that after they had all returned to camp defendant said she had decided to come down with a boy working at the camp; that plaintiff and Mr. Peigh went up back of the Boy Scout camp that afternoon to try the gun, and when he returned about two hours later defendant and the baby, and all defendant's clothes, were gone; that he looked for a note, but there was none; that he then went to the store to learn what had happened; that he did not know at that time where defendant had gone, or what had become of their child; that besides going to Lodi to ascertain the whereabóuts of defendant, he also made

a trip to Carson City and called up the ticket agent to learn whether any one of her description had bought a ticket to go on the train.

In the foregoing summaries, we have not detailed all the testimony relating to plaintiff's physical presence in Nevada for the required time before commencing his suit, for the reason that appellant has challenged only the bona fide character of his residence.

■ The law of Nevada relating to residence necessary to confer jurisdiction in divorce cases is well established. In this case it was necessary for plaintiff to satisfy the jury that his physical presence in this state for the whole statutory period (Comp. Laws, sec. 9460) preceding and including the date of commencement of his action was accompanied by the intent to make Nevada his home, and to remain here permanently, or at least for an indefinite time. The jury not only returned a verdict for plaintiff on the issue of cruelty, but made special findings that at the time of filing his complaint he was a resident of Ormsby County and had been a resident of the State of Nevada for a total period of six weeks preceding the filing of said complaint. The trial court having, like the jury, heard the witnesses, observed their demeanor on the witness stand and their manner of testifying, denied defendant's motion for a new trial.

■■ The record presents a substantial conflict in the evidence. Even so, it would be our duty to adjudge a reversal if we could say that in our opinion the verdict and findings of the jury were clearly wrong. A careful study of the record and briefs, and consideration of the oral arguments, have not convinced us that such was the case. While we entertain some doubt as to plaintiff's good faith, it is not clear to us that he intended to remain in this state for only such time as would be necessary to enable him to secure or attempt to secure a decree of divorce, and then return to Norwich, or leave Nevada to make his home elsewhere.

In the course of our study of the record on appeal, we noted two things which tend in some degree to support

the conclusion we have arrived at regarding plaintiff's residence. In the first place, defendant's opening statement to the jury does not stress the question as to the good faith of plaintiff's residence. The statement is so short that we set it forth here in full: "May it please the court, and ladies and gentlemen of the jury, the defendant in this case has denied in toto that she has committed any act of cruelty at all against the plaintiff which would entitle him to get a divorce. She admits the marriage; she admits the existence of one lovely little boy, born the issue of the marriage; and denies all the other allegations of the complaint with respect to cruelty and regarding the existence of no community property, and so forth. She, however, sets up no affirmative defense, no affirmative plea for divorce on her side, or for separate maintenance, but merely rests with the denial of the charges made by the plaintiff that she had been cruel in any way whatsoever, and prays that the plaintiff take nothing by his complaint and that he be denied a divorce as prayed for, and she prays for an order of court that the defendant support her and the minor child in the amount of two hundred fifty dollars a month. The issues then are joined upon the denial, straight up, of any acts of cruelty on her part toward the plaintiff."

The second observation we think it proper to make is that in her answer to the amended complaint defendant denied plaintiff's allegation as to his residence in the following language: "For her answer to Paragraph I of the amended complaint the defendant admits that plaintiff is a citizen of the United States but as to the other allegations of paragraph I, defendant has not sufficient knowledge or information upon which to base a belief and basing her denial on that ground denies that the plaintiff is now and/or has been for more than six weeks of any other time or period immediately preceding the filing of his complaint continuously or at all a resident of the State of Nevada and domiciled therein and/or a resident of the County of Ormsby in said

state." The answer was filed March 5, 1934, nearly seven months after plaintiff and defendant arrived at Zephyr Cove. It was verified by defendant on February 24, 1934. At that time she certainly had knowledge of most of the important facts and circumstances upon which she has based her contention that plaintiff's residence in Nevada was not bona fide. If plaintiff's wife, under the circumstances shown by the record, was unable, more than six months after he first came to Nevada, to even form a belief as to the bona fide character of his residence in this state, it is not surprising that this court, on appeal, is not clearly convinced that the jury was wrong in deciding that plaintiff was a bona fide resident of Nevada as alleged in his amended complaint.

■ The trial court gave the following instruction to the jury: "In any action for divorce when it shall appear that both husband and wife have been guilty of a wrong or wrongs, which may constitute grounds for a divorce, the court shall not for this reason deny a divorce, but in its discretion may grant a divorce to the party least in fault." Appellant contends that said instruction was calculated to mislead the jury into believing that defendant was likewise applying for a divorce, and that they could grant a divorce to either party, or that said instruction could be construed by the jury as authorizing the jury to grant a divorce to one party or the other even though the defendant did not apply for a divorce. We are satisfied that the jury could not have been misled into believing that defendant as well as plaintiff was applying for divorce, because the jury was not only informed as to the contents of the pleadings, but defendant's opening statement, as has been seen, made it very plain that she was not asking for a divorce. The quoted instruction is simply a statement of a Nevada statute (Comp. Laws, sec. 9467.01) and was not improper because, whether defendant prayed for a divorce or not, it was still within the province of the jury to award a decree to

plaintiff if both parties were guilty of conduct constituting ground for divorce, provided plaintiff was the party least in fault.

The court also gave the following instruction to the jury: "The jury are instructed that where, in a divorce case, jurisdiction to grant a divorce is predicated upon the residence of the plaintiff, an essential element of that jurisdiction is that the plaintiff shall have been actually, physically and corporeally present, within the State of Nevada, for a period of not less than six weeks preceding the commencement of the action; but this period of six weeks need not be continuous. If, after such presence within the State of Nevada, for a portion of six weeks, you find that the plaintiff absented himself from the State for a short time, with the intention in good faith to return without delay and continue his residence and thereafter did so return and thereafter continued such presence within the State for such a time that the two periods of such presence, aggregated, preceding the commencement of this action, a total of at least six weeks, then as a matter of law, the plaintiff was actually, physically and corporeally present within the State of Nevada, for a period of not less than six weeks preceding the commencement of the action." Appellant complains of this instruction, because, as she contends, it entirely omits the essential jurisdictional element of bona fide intention on the part of plaintiff, during the whole period of his required corporeal presence in this state, to make Nevada his real home. The manifest purpose of this instruction, however, was merely to state the requirements of Nevada divorce law as to the period of physical residence required. The record shows that the element of bona fide intention was covered in another instruction.

Finding no error in the record, the judgment and order appealed from are affirmed.