274 P.2d 127

Edgar P. CROWNOVER,
Plaintiff-Appellee.

v.

Mary E. CROWNOVER,
Defendant-Appellant.

No. 5787.

Supreme Court of New Mexico.

Sept. 9, 1954.

Grantham, Spann & Sanchez, Albuquerque, for appellant.

Vance Mauney, Albuquerque, for appellee.

SEYMOUR, Justice.

Appeal is taken from judgment of the trial court awarding appellee (plaintiff below)· an absolute divorce on incompatibility.

Appellee is a naval officer; he arrived in New Mexico September 18, 1952 under military orders directing a permanent change of station to Sandia Base, Bernalillo County, New Mexico. Appellee filed suit November 11, 1953 alleging service in a military branch of the United States Government and that he had "been continuously stationed at Sandia Base, New Mexico within the State of New Mexico for a period of one year next preceding the filing of this Complaint." Appellant's answer admitted the military service and the alleged station at the time of the filing of complaint but denied that the plaintiff had "been continuously stationed at Sandia Base, or any other military base or installation in the State of New Mexico, for one year next preceding the filing of the complaint herein."

Appellee left Sandia Base April 17, 1953 on temporary duty orders placing him physically with the Pacific Fleet and directing his return to Sandia Base upon completion of that temporary duty. The temporary duty was completed and return made to Sandia Base November 6, 1953, five days prior to the filing of complaint. Therefore, appellee, after coming to New Mexico under military orders September 18, 1952, in the first year spent approximately seven months here in New Mexico and five months outside New Mexico on temporary duty; approximately at the conclusion of the thirteenth month following his original arrival in New Mexico, he returned to his permanent station there and filed this suit. His total absence from New Mexico was slightly in excess of six months.

Parenthetically, it should be stated that both parties appeared in court, litigated all matters involved, and there is no question of the existence of personal jurisdiction of the parties.

Appellant relies upon four points which may be stated as follows: (1) That the trial court erred in holding appellee to have been "continuously stationed" at Sandia Base for one year next preceding the filing of complaint pursuant to § 25–704, N.M.S.A. 1941, as amended by ch. 107, § 1, 1951 Session Laws. (2) That the above cited act is unconstitutional as violative of art. 1, § 8, par. 17 of the Constitution of the United States. (3) That this act is unconstitutional as violative of art. 4, § 24, and art. 2, § 18, N.M.Const. (4) That this act is unconstitutional as violative of art. 7, § 4, N.M.Const.

The act in question is:

"25–704. Residence requirement.— The plaintiff in action for the dissolution of the bonds of matrimony must have been an actual resident, in good faith, of the state for one (1) year next preceding the filing of his or her complaint; Provided, however, that in a suit for the dissolution of the bonds of matrimony wherein the wife is plaintiff, the residence of the husband in this state shall inure to her benefit and she may institute such action setting up any of the causes mentioned in section 2773 (25–701) immediately after the accrual thereof, providing her husband shall have been qualified as to residence to institute a similar action; and provided further, persons serving in any military branch of the United States government who have been continuously stationed in any military base or installation in the state of New Mexico for such period of one (1) year, shall for the purposes hereof, be deemed residents in good faith of the state and county where such military base or installation is located. (Laws 1901, ch. 62, § 25; Code 1915, § 2776; Laws 1921, ch. 106, § 1, p. 192; C.S.

1929, § 68–504; Laws 1951, ch. 107, § 1.) "

■ Appellant's contention under Point IV, subsequent to his presentation thereof in the trial court, was specifically determined adversely to his position in Wilson v. Wilson, 1954, 58 N.M. 411, 272 P.2d 319. The decision in that case and the major presentation of this point by appellant, however, are confined to the very narrow problem of the applicability of art. 7, § 4, N.M. Const., to residence for the purpose of divorce. Subsequently in this opinion we shall return to a broader phase of this question of residence.

■■ Appellant's Point III asserts that this act is violative of the above cited New Mexico constitutional provision prohibiting local or special laws and guaranteeing equal protection of the laws. We find no merit in this contention. The language of the Court in Craig v. Craig, 1936, 143 Kan. 624, 56 P.2d 464, 467, expresses in substance the thinking of our Court:

"The specific complaint of defendant is, unless *actual residence* or *domicile* on the reservation is required, the amendment discriminates between persons residing on the reservation and those residing off the reservation within the state. It is insisted that is invalid special legislation. The contention is not sound. In the first place, the amendment is not special legislation. Second, it is valid general legislation. The amendment applies to all within the state similarly situated. Its application is therefore general to the entire class it embraces. It is not a false or deficient classification, but a genuine, natural, reasonable, and complete classification. It rests upon a substantial basis. It operates uniformly on all members of the class. It is neither arbitrary nor capricious. In discussing the question of special legislation, this court in State v. Board of Com'rs of Butler County, 77 Kan. 527, 533, 94 P. 1004, said: 'If, however, it operates uniformly on all the members of the class to which it applies, it is not open to the objection, provided the classification adopted by the Legislature is not an arbitrary or capricious one. The Legislature has the power to enact laws of a general nature which will be applicable only to a certain portion of the state or to a certain class of citizens.'

"In the case of Rambo v. Larrabee, 67 Kan. 634, 73 P. 915, it was held: 'An act, to have a uniform operation throughout the state, need not affect every individual, every class, or every community alike. It is competent for the Legislature to classify and adapt a law general in its nature to a class; but such classification must be a natural, and not an arbitrary or fictitious one,

and the operation of such general law must be as general throughout the state as is the genera therein provided for.' Syl. 5. See, also, Cole v. Dorr, 80 Kan. 251, 101 P. 1016, 22 L.R.A.,N.S., 534; State ex rel. v. Kansas City, 125 Kan. 88, 262 P. 1032; State ex rel. v. French, 130 Kan. 464, 286 P. 204; 25 R.C.L. 815–818."

This language and reasoning, while addressed to "special legislation," are equally decisive on any question under the "equal protection" clause of the Constitution. Our own cases on the prohibition against local or special laws, while not dealing with the exact problem presented here, support our thinking on this problem. Hutcheson v. Atherton, 1940, 44 N.M. 144, 99 P.2d 462; Davy v. McNeill, 1925, 31 N.M. 7, 240 P. 482; State v. Atchison T. & S. F. Ry. Co., 1915, 20 N.M. 562, 151 P. 305.

Appellant's Points II and I raise more difficult questions. As to Point II, New Mexico ceded exclusive jurisdiction over Sandia Base to the United States under §§ 8–202 and 8–203, 1941 Comp.:

"8–202. Consent to acquisition of land for federal purposes.—The consent of the state of New Mexico is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the Constitution of the United States to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in this state required for sites for custom-houses, court-houses, post-offices, arsenals, or other public buildings whatever, or for any other purposes of the government.

"8–203. Jurisdiction over federal land — Limitation — Duration. — Exclusive jurisdiction in and over any land so acquired by the United States shall be, and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this state; but the jurisdiction so ceded shall continue no longer than the United States shall own such lands."

Appellant states his contention clearly: "The legislature, in passing the 1951 amendment to § 25–704, 1941 Comp., supra, clearly was attempting to do that which is exclusively reserved to the federal government in the constitutional provision above quoted, and to which the State of New Mexico has assented by legislative enactment."

In support of her position, appellant cites Arledge v. Mabry, 1948, 52 N.M. 303, 197 P.2d 884, and cases cited therein, wherein it was decided that that portion of the Los Alamos Project ceded to the United States under similar statutes and constitutional provisions was not "in New Mexico" within the meaning of the language of our constitutional qualifications for electors, with the resulting decision that persons resident thereon could not vote in New Mexico.

Cited by appellee on the opposite side of this question is the case of State v. Mimms, 1939, 43 N.M. 318, 92 P.2d 993, determining that New Mexico had the right to require payment of a license fee for the sale of intoxicating liquor upon lands owned and under the exclusive jurisdiction of the United States. The availability of these decisions makes it unnecessary to incorporate their language here. Suffice it to say that this Court had difficulty when faced with the problem of harmonizing its thinking in the Arledge case with the earlier Mimms case. The two come close to conflict; however, it is perhaps wise to deny that one of these cases should be overruled and one followed. The concept of exclusive jurisdiction of the United States over lands ceded by the states is a developing one as are all such concepts with their application to the increasing number of factual situations; the interstate commerce clause is an example.

With the foregoing as justification for adopting neither of the cited cases as controlling, we have been cited to a single case dealing with the exact problem, a case already cited, Craig v. Craig, supra. Faced with the identical problem, the Court there concluded: "Does our divorce law, including the amendment, constitute an unlawful encroachment on federal jurisdiction? We think it does not." The language, reasoning and authorities there cited are entirely pertinent and to this Court, convincing.

We refer to that portion of the opinion appearing under headnote 3 of 56 P.2d 464. Satisfied that the correct result was there reached, our conclusion in the instant case must be the same and, therefore, appellant's contention under Point II must be denied.

Appellant's contention under Point I is even more difficult of solution. Under the admitted factual situation here present—thirteen months of permanent station in New Mexico with physical presence during the first seven months, physical absence during the next six months, and then a physical return to New Mexico, the permanent station—does appellee come within the language of § 25–704, supra, as amended? Was he "continuously stationed in any military base or installation in the state of New Mexico for" "one (1) year next preceding the filing of his * * * complaint"?

For the purpose of deciding this question, the value of an extensive weighing of extreme factual combinations is dubious. There would be on the one side continuous physical presence at Sandia Base for a full year, interrupted by a weekend's fishing in Colorado, as against the possibility of a permanent assignment to Sandia Base, interrupted on the first day or prior to arrival by a temporary assignment requiring physical presence outside the state of New Mexico for the whole of the ensuing year.

Appellant defines "station" as a military post where military duty is performed, and offers the test of whether or not for the period of one year before filing his complaint, appellee was performing military duty at Sandia Base without substantial interruption. Appellant's answer to this question would be, "no."

The legislature had available for choice many words; it could have incorporated in the act the words, "physically present," or it could have eliminated the word, "continuously." For an interpretation of the words, "continuously stationed," we must look to the intent of the legislature and the canons of statutory construction set forth in our many cases on that subject. Reese v. Dempsey, 1944, 48 N.M. 417, 152 P.2d 157; Town of Clayton v. Colorado & S. Ry. Co., 10 Cir., 1931, 51 F.2d 977, 82 A.L. R. 417; Fisherdick v. San Juan County Bd. of Ed., 1925, 30 N.M. 454, 236 P. 743; State v. Llewellyn, 1917, 23 N.M. 43, 167 P. 414; State ex rel. Lorenzino v. County Com'rs, 1915, 20 N.M. 67, 145 P. 1083, L.R.A.1915C, 898; Rapp v. Venable, 1910, 15 N.M. 509, 110 P. 834; Territory ex rel. Wade v. Ashenfelter, 1887, 4 N.M., Gild., 93, 12 P. 879; Leitensdorfer v. Webb, 1857, 1 N.M. 34; Id., 20 How. 176, 61 U.S. 176, 15 L.Ed. 891.

In the present instance the legislative intent is more than ordinarily clear. Allen v. Allen, 1948, 52 N.M. 174, 194 P.2d 270, held that a soldier who lived continuously in New Mexico during the required period and rented a home for himself and family did not acquire the actual residence, in good faith, required by the statute before amendment; Chaney v. Chaney, 1949, 53 N.M. 66, 201 P.2d 782, held that a residence at Los Alamos on condemned land belonging to the United States was insufficient to supply the required residence under the act before amendment.

It was to alleviate the harshness of these decisions in their effect upon the domestic affairs of military personnel that the amendment was passed. And there are certain conclusions that one cannot escape. At the present time, and it is almost certain for many years to come, a large number of our young men and women, by demand of conscience or by law, will be required to enter the military service. The primary purpose of that service is the preservation for our citizens of all of the civil and other rights we deem so precious. Such service comprehends for its members the temporary loss of many of those rights, one of the most cherished of which is freedom of movement from place to place and choice of residence and domicile. Because by chance and tradition, divorce, as a part of the field of domestic relations, has become closely tied to the concepts of residence and domicile, is not alone enough to justify depriving this group in military service of a civil right available to those not in service, and one which could be available to many·

of them without detriment or loss to their important duties. This thought was persuasive in our conclusion concerning appellant's preceding point and certainly impels this Court toward any legally sound interpretation of the statutory language which may serve to implement the legislative intent.

While we have already disposed of the constitutional questions raised, we are conscious of certain consequences which would or might flow from a decision in favor of the constitutional contentions of either side. Although they do not bear directly upon an interpretation of the words, "continuously stationed," we mention them at this point in our opinion because they do bear obliquely upon the power of this Court to effectively implement the intention of the legislature: (1) There have been a great many divorces granted in New Mexico to well-intentioned military personnel under this act; subsequent marriages have been contracted; children have been born of such marriages; to now render illegal those divorces and irregular all of the human relations predicated thereon can be considered only for the most compelling reasons. This we have determined not to do as is apparent from our disposition of the three constitutional questions already considered. (2) While this Court can determine the validity of a divorce proceedings within its own boundaries and enforce its recognition, it cannot determine that other states will give full faith and credit to its judgments in this field. In the event they do not, the consequences for military personnel divorced under our statute, in terms of orderly human relationships in the future, approach in seriousness the consequences of holding this statute invalid. Therefore, having determined upon the constitutionality of the act on the points raised by the parties, we shall consider a final constitutional question which we believe to be substantially raised by appellant, for the purpose of concluding constitutional attacks upon this act and for the further purpose of reaching a determination of our last question on grounds calculated to minimize the chance of having our judgments denied full faith and credit by the courts of other states.

■ In Allen v. Allen, supra [52 N.M. 174, 194 P.2d 273], our Court said: "While ordinarily the domicile of a soldier is not changed or lost by his induction into military service, where he is under orders from his superiors and subject to transfer to different posts, as in the case in bar, yet, a new domicile may be acquired by a soldier as well as by any civilian if both the fact and the intent concur." The concluding sentence of appellant's brief relevant to the foregoing quotation is sufficient to raise this further and final jurisdictional question; that sentence is: "The reasoning of the Allen case, supra, is as sound in construing the statute as now amended, as it was before such amendment was passed."

The jurisdictional question raised is whether or not "domicile" is an essential base for the court's jurisdiction of a divorce action; and assuming the answer to be in the affirmative, the constitutional question is whether the statutory presumption created by the amendment is an unreasonable interference by the legislative branch of government with the judicial branch of government. As to the first jurisdictional question, both as a matter of present judgment and by reason of our earlier decisions, Allen v. Allen, supra, our answer must be in the affirmative, residence for the required period of time with domiciliary intent is a necessary jurisdictional prerequisite of divorce in New Mexico.

 The legislature has said, however, that a member of the military "continuously stationed" at a base in New Mexico for one year, for the purposes of this act, shall be deemed a resident of New Mexico with the necessary domiciliary intent. Is such a presumption an unwarranted interference by the legislature with the judicial branch of government? We think not. In the case of Craig v. Craig, supra, upon which heavy reliance is placed by this Court in disposing of other constitutional questions, this particular question, as we read that case, was disposed of upon the basis that the legislature obviously dispensed with the requirement of domicile and the Court was willing to abide by the legislative intent. We are not satisfied to drop the matter at this point,

because an assertion by us that domicile is not a prerequisite to divorce jurisdiction would greatly imperil the full faith and credit which we believe should be given by the courts of other states to divorces granted under this act.

A precisely parallel question arose in Alton v. Alton, 3 Cir., 1953, 207 F.2d 667, certiorari granted, 1954, 347 U.S. 911, 74 S.Ct. 478, under a 1953 amendment by the Virgin Islands of its divorce law. By per curiam decision of the United States Supreme Court, June 1, 1954, the entire proceeding was dismissed as moot. 347 U.S. 610, 74 S.Ct. 736. That law made six weeks presence of plaintiff prima facie evidence of domicile. On appeal from the trial court's decision denying jurisdiction, the Third Circuit Court of Appeals, three judges dissenting, affirmed the lower court in holding the statutory presumption unconstitutional. Cornell L.Q., Vol. 39, No. 2, p. 293, comments in detail upon this decision, discussing briefly and effectively the development of "the law of migratory divorce," and explores the application of the principles of full faith and credit and of due process to this problem. We find this article of great assistance in reaching a conclusion.

Parenthetically: The second phase of the Alton case is not before us; the statute provided further that if jurisdiction in personam was acquired over defendant, domicile was not necessary to jurisdiction.

This, too, was held unconstitutional. In the instant case, as heretofore stated, the trial court had such personal jurisdiction; moreover, we are already committed to the principle that regardless of that fact, domiciliary residence is a requisite of jurisdiction. Absent the personal jurisdiction of defendant which we have here, and assuming momentarily domiciliary jurisdiction under the amendment, the question raised is one of "due process" not involved in the instant case, although important in the future as to whether or not our judgments would be given full faith and credit in a case of constructive service.

It is our conclusion that the statutory presumption is not unconstitutional. There is a rational connection between the fact proved (one year continuously stationed in New Mexico) and the fact presumed (domiciliary intent). To reach this conclusion requires a step beyond the reasoning of any adjudicated cases called to our attention. We find justification in taking that step upon the following theory: The issue of the existence of residence with domiciliary intent for divorce purposes has centered for decades upon the "integrity" of the intent of the parties concerned. A blunt statement of the question would be: Is the plaintiff lying in his or her assertion of domiciliary intent as it is coupled with residence for an arbitrary period of time? This basic question of integrity, as a matter of logic, has no place in an action by the average member of the military service under the amendment, since the enactment of the amendment was necessitated by the recognition of the fact that the duties of the military and its absolute power to control the physical whereabouts of its members, placed such intent in abeyance for the duration of service.

The exigencies of the cases have already developed different concepts of domicile which exist in this field, and have gone so far as to recognize that two or perhaps more domiciles can be co-existent at the same time. Under certain circumstances, both husband and wife, living in different states, may have domicile in their particular states for the purposes of divorce; there is the further facet of "matrimonial domicile." Today we know there exists a way of living involving many of our citizens which might be termed "military domicile." Prior to the amendment, "good faith" was a primary requisite for divorce and supplied the domiciliary intent to the actual residence. The legislature has said in effect, and properly so, that a member of the military is here under orders, his failure to obey is subject to punishment, his "good faith" cannot be questioned and will be presumed upon showing that he has been "continuously stationed" in the state for the year next preceding the filing of his complaint.

We shall not lengthen this opinion with a discussion of the many factors persuasive to this point of view: (1) The permanent

station of military personnel for a year necessarily becomes his or her base of operations for current living. (2) The avowed aim of our government it to retain trained personnel in the service as a lifetime occupation, and continuous efforts are made in that regard to confer upon such personnel security and as many of the benefits of life in our land as are compatible with the duties of such service. There are many other factors of a similar kind which immediately spring to mind.

Therefore, we conclude that the presumption of domicile established by the amendment is not an unconstitutional interference with the judicial branch of government. We do not feel that the extension of the idea of domicile beyond the area of the integrity of individual intent to an area which might be called "military domicile" in which individual intent has no place, is an extension which will appreciably weaken or disturb the traditional concept of domicile and the large body of fixed law resting thereon.

██ Having progressed thus far, it remains only to determine whether this appellee can meet the literal test of being "continuously stationed" in New Mexico. In the light of the purpose of the amendment and the foregoing discussion, we feel that he does meet it. Had the lapsed time outside New Mexico in this case been composed of weekly training flights instead of

an uninterrupted period, we would not hesitate in this conclusion. This litigant is a naval officer; should his substantial rights be dictated by the branch of service or character of duty? The answer should be, "no," if it can be given practical application. Again conscious of the intent of the legislature, it would seem that the language of the statute is broad enough to comprehend one who is permanently stationed in New Mexico for one year next preceding the filing of suit, although physically absent for substantial periods of time, or to comprehend one temporarily stationed in New Mexico for one year next preceding the filing of complaint, who, as appellant phrases it, physically performs military duty at that temporary base for one year without substantial interruption.

We specifically disavow the intention of deciding prior to submission the law applicable to different factual situations. The language of the preceding paragraph merely expresses the line of reasoning whereby it is determined in the instant case that appellee was "continuously stationed" in New Mexico within the meaning of the amended statute.

A final word on the problem of full faith and credit: The residence of one year required in New Mexico is the measure of time most commonly in use throughout the different states. This is a guarantee that this state is not in the objectionable competitive market for transient divorce busi-

ness. There is no comparison between the obvious prostitution of the idea of domicile arising from the "invitation to divorce" extended by Nevada and the Virgin Islands, where the only reason for physical presence is divorce, and the presence of military personnel, physical or otherwise, at a military installation in New Mexico for one year, from which they may not depart, absent orders, without severe disciplinary action. The continuous station of the military in New Mexico for one year, with: (1) no possible question of their good faith; (2) the knowledge that many have and many will make their homes here at the conclusion of their service; (3) the mutual aim of both military and civilian policy to make the military a welcome and useful part of the community in which they are stationed;—such station is an adequate basis for the statutory presumption of residence, with the requisite domiciliary intent, established by the amended act in giving our courts jurisdiction of this type of divorce. It is our belief that the integrity of such domicile is entitled to full faith and credit once it is adjudicated by our courts.

The question has been raised as to whether this presumption is conclusive or rebuttable. Upon proof of continuous station pursuant to the statute, the presumption of domicile is conclusive; at the same time, we believe that extrinsic evidence directed to the issue of continuous station could destroy the premise of the presumption;

and, if it should be destroyed, of necessity the presumption fails.

Judgment is affirmed. It is so ordered.

SADLER, COMPTON and LUJAN, JJ., concur.

McGHEE, C. J., concurring specially.

McGHEE, Chief Justice (specially concurring).

I fully agree with all of the opinion by Mr. Justice Seymour, except I do not believe what I deem to be an approving pat on the back for what is said in Allen v. Allen, 1948, 52 N.M. 174, 194 P.2d 270, in appellant's brief is sufficient to raise the constitutional and jurisdictional questions treated. Also, so long as jurisdiction to grant divorce decrees under § 25–704, N.M. S.A., 1941, as amended, is upheld, I would prefer to postpone discussion of this involved question until such became necessary. However, the majority being of contrary opinion, I desire to state the manner in which I arrive at the same end result, but upon different reasoning, as follows:

The novelty of the majority opinion has already been suggested in its consideration of the requirements of the full faith and credit clause for external validity of a divorce case before us on direct appeal. Yet, like the majority, I am persuaded so long as the issue of domicile has been considered, it is too late in the day to deny the

gravity of the problem of such external validity. The majority opinion does not assert that if divorce decrees granted under the present amendment are internally valid that such legislation may be held unconstitutional on the ground the decrees cannot command extra-territorial recognition, and I entertain serious question whether such action could be taken. The orthodox view of this matter is stated in Allen v. Allen, supra, as follows:

> "The right to apply for or obtain a divorce is not a natural one, but is accorded only by reason of statute, and the state has the right to determine who are entitled to use its courts for that purpose and upon what conditions they may do so. 17 Am.Jur. section 8, page 151."

So long as the jurisdictional basis of the enactment before the court fulfills the requirements of due process, I see not how it could otherwise be denounced, as I do not share in the view the enactment creates a presumption raising the question of unlawful interference with the judicial branch of government by the legislative branch. However, I agree with the majority justices that if by considering the cases which have arisen under the full faith and credit clause today's decision can be clarified and some measure of assurance afforded to persons seeking the dissolution of marriage under such enactment, the undertaking is not misguided.

I would phrase the questions to be dealt with as follows: (1) Does the legislature of this state have the power to provide decrees of divorce may be granted to military personnel upon the basis of their being continuously stationed at some military installation in this state for a period of twelve months preceding the bringing of action? Here the test to be met lies in the due process clause. (2) If the legislature has such power, and has validly exercised it, is there likelihood decrees granted thereunder may be denied extra-territorial recognition by the courts of our sister states? Here the test to be met lies in the pronouncements of the United States Supreme Court in cases arising under the full faith and credit clause.

In view of the fact there are very few cases dealing with the problem posed in the first question above, the Kansas case of Craig v. Craig, 1936, 143 Kan. 624, 56 P.2d 464, not having specifically treated such question, it is in the matter of extra-territorial recognition that we find what material there is on the problem of internal validity.

The tentative draft, No. 1, Restatement, Conflict of Laws (1953), § 111, states:

> "A state lacks judicial jurisdiction to dissolve a marriage when neither spouse is domiciled within the state.
> "Comment:
> "a. Rationale. A divorce granted in a State of the United States in which

neither of the spouses is domiciled is void even in the State where rendered."

Domicile is defined in 28 C.J.S., Domicile, § 1, p. 3, as:

" * * * the relation which the law creates between an individual and a particular locality or country. What has been said to be the most comprehensive and correct definition which could be given is that, in a strict legal sense, the domicile of a person is the place where he has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning."

It is further said in the same work at § 12 g. (1):

"The domicile of a soldier or sailor in service generally remains unchanged, domicile being neither gained nor lost by his being temporarily stationed in line of duty at a particular place; but a new domicile may be acquired if fact and intent concur."

See Allen v. Allen, supra.

It is my belief the quotation from the tentative draft of the Restatement above is merely an assertion of policy—not a pronouncement of unquestioned general law, and this conclusion has been reached after a careful study of the history of divorce and examination of many decisions and articles analyzing them. It is hoped that the discussion to follow will, with as little detail as possible, describe at least the broad lines of the matters leading to such conclusion.

Though the procedure is unorthodox, perhaps the best place to begin this description is with a case lying somewhere near the middle of the mass of decisions, Williams v. State of North Carolina, 1945, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366, frequently referred to as the "second Williams decision."

That case arose upon prosecution for bigamy against defendants who had left their homes and spouses in North Carolina and journeyed to Nevada, where, upon constructive service, they secured divorces from their respective, non-appearing spouses, under decrees reciting the Nevada plaintiffs were bona fide residents of Nevada and had been such for more than six weeks preceding the bringing of their actions. As soon as the divorces were secured the plaintiffs married each other in Nevada and returned to North Carolina, where they lived together until prosecution was commenced.

Certiorari was granted in Williams v. State of North Carolina, 1942, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279, 143 A.L.R. 1273, the "first Williams decision," to review the validity of their convictions for bigamy and the convictions were reversed and the cases remanded. It is not necessary

at this point to examine that decision minutely, except to point out that it ruled:

"The full faith and credit clause of the Federal Constitution requires the extraterritorial recognition of the validity of a divorce decree obtained in accordance with the requirements of procedural due process in a state by a spouse who under the law of such state had acquired a bona fide domicil there, although the spouse who remained in the state of the original matrimonial domicil did not appear in the divorce suit and was not served with process in the state in which the divorce was granted." (Syllabus No. 1, 143 A.L.R. 1273.)

After new trials and convictions for bigamy of the original Nevada plaintiffs, certiorari was again granted to review the convictions upon contention that full faith and credit had not been accorded the divorce decrees of one of the courts of Nevada. The convictions were affirmed, and it was held:

"* * * North Carolina could decline to give full faith and credit to a decree of a Nevada court where, contrary to the findings of the Nevada court in rendering the divorce decree, its (North Carolina's) courts find that the plaintiff in the Nevada divorce suit had not acquired a bona fide domicil in Nevada. * * *" (Quoting from Annotation 157 A.L.R. 1399, p. 1406.)

The significance of this opinion lies for us in the unequivocal assertion by the Supreme Court [325 U.S. 226, 65 S.Ct. 1095]:

"Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil. Bell v. Bell, 181 U.S. 175, 21 S.Ct. 551, 45 L.Ed. 804; Andrews v. Andrews, 188 U.S. 14, 23 S.Ct. 237, 47 L.Ed. 366. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. * * *"

Further it is said:

"* * * the decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, and domicil is a jurisdictional fact. * * *"

At least three of the justices of the Supreme Court held the view the divorces granted were valid in Nevada, if Nevada chose to uphold them. (See Justice Murphy's concurring opinion, in which Chief Justice Stone and Justice Jackson concurred.) Certainly the majority opinion nowhere declares the decrees were void where rendered, unless the requirements of procedural due process were not met.

Thomas Reed Powell in an article in 58 Harv.L.Rev., 930, entitled "And Repent At Leisure," has asserted: "Unfortunately

they (the majority) do not make clear whether the requirements of procedure go beyond adequate notice to the libellee." This author, after a searching analysis of the Williams decisions concludes:

"* * * Nevertheless there remains at least a hypothetical constitutional question as to the degree of correspondence between the tests for internal validity and those for external compulsory recognition. In his concurring opinion in the earlier Williams case, Mr. Justice Frankfurter indicates his view that a full faith and credit issue may remain even when due process has accompanied the award of the questioned decree. * * * In any event, * * * internal invalidity may preclude external recognition without any corollary that a sanction of external rejection necessarily carries condemnation of domestic authority. Three and probably four of the majority Justices in the second Williams case are on record in favor of a degree of external power to disregard what may be internally sufficient. * * *" pp. 999, 1000, 1001, 58 Harv.L.Rev.

It is not easy to assess on just which constitutional provision the Williams' divorce decrees went foul. There is as is indicated above considerable basis for saying the decision was rendered solely under the full faith and credit clause—in other words,

that Nevada's divorce statute being based on domicile, Latterner v. Latterner, 1929, 51 Nev. 285, 274 P. 194; Lamb v. Lamb, 1937, 57 Nev. 421, 65 P.2d 872, a divorce decree granted there absent the fact of bona fide domicile is not valid in Nevada, hence not entitled to obligatory full faith and credit elsewhere. But there is also the strong suggestion that a divorce granted anywhere, under any statute, is not entitled to obligatory extra-territorial effect unless one of the parties was a bona fide domiciliary of the granting state. At least one of the dissenting justices, Justice Black, viewed this suggestion as invoking the due process clause, which would look to internal as well as external invalidity of the proceedings and decrees.

But, putting conjecture to one side, this much is clear: The second Williams decision does not expressly employ the due process clause in reaching the result announced. It should also be noted, as does Justice Black, that the decision in Andrews v. Andrews, 1903, 188 U.S. 14, 32, 23 S.Ct. 237, 240, 47 L.Ed. 366, relied upon in the majority opinion as authority for the proposition is founded on domicile, staunchly declares: "* * * it is certain that the Constitution of the United States confers no power whatever upon the government of the United States to regulate marriage in the states, or its dissolution * * *." So it appears, as the learned professor Powell has discerned, there may well be a

hiatus between the requirements for internal validity and compulsory external recognition.

From this starting point, then, let us go back to the early history of divorce in this country. The books, Keezer, Marriage and Divorce (2d. Ed., 1923) § 195, page 167, et seq., and Ireland and Galindez, Divorce in the Americas (1947), Ch. 1, contain descriptions of the early procedure. Dissolution of marriage by divorce was administered in England by the ecclesiastical courts at the time of colonization of America and the laws relating to the matter did not become a part of the common law of England and consequently never came under the common law of the United States. Having no ecclesiastical courts, the power over divorce remained in the various legislatures of the states. Maynard v. Hill, 1888, 125 U.S. 190, 8 S.Ct. 723, 728, 31 L.Ed. 654, is the leading case regarding legislative divorce. There a husband left his wife in Ohio and moved to Oregon, promising to send for her, but he never did. Later he was successful in getting the Oregon territorial legislature to pass a special act divorcing him from his wife and he remarried. The validity of the divorce was upheld and the Supreme Court said:

"If the Assembly possessed the power to grant a divorce in any case, its jurisdiction to legislate upon his (the husband's) status, he being a *resident* of the territory, is undoubted * *." (Emphasis supplied.)

The development of the concept of domicile as a jurisdictional basis for divorce is traced with great scholarship in an article by Mark De Wolfe Howe, "Foreign Divorce Decrees in New York State," 40 Col.L.Rev. 373 (1940). Howe in considering two New York cases which he felt undermined the general assumption that domicile was a jurisdictional essential in divorce, Gould v. Gould, 1923, 235 N.Y. 14, 138 N.E. 490 and Glaser v. Glaser, 1938, 276 N.Y. 296, 12 N.E.2d 305, explored the New York and American decisions in the early nineteenth century to show the variety of theories of jurisdiction over divorce then existing. He employed three theories described by Dicey in his work, Conflict of Laws, discussed at pages 217, 218 (6th Ed., 1949). Roughly paraphrased these theories are the contract theory, the penal theory, and lastly, and most familiar to us, the status theory. Under the first of these theories it was thought the right to divorce depended upon the terms of the marriage contract, and consequently upon the law under which the marriage was celebrated, and it was said jurisdiction over divorce belonged exclusively to the courts of the country where the marriage took place. Under the penal theory, divorce was viewed as a penalty inflicted for offenses against the marriage. Under this view, even temporary residence in a country in which the

offense was committed was sufficient to confer jurisdiction upon its courts. Under the status theory, a divorce is an act by the state putting an end to the marriage status, and regardless of where or under what law the marriage was celebrated, regardless of where or what act gave rise to cause for divorce, jurisdiction to dissolve a marriage belongs to the courts of the country where the parties are domiciled, for it is by the law of this country the status is determined. According to Dicey, the contract theory was popular in England in its early law, while the penal theory was employed to some extent in Scotland in earlier times. It is not apparent that the contract theory ever enjoyed any particular popularity in the United States, but the penal theory did. Howe points to early American cases where the influence of the penal theory was effective, among them the case of Borden v. Fitch, 1818, 15 Johns., N.Y., 121, where a Vermont decree of divorce on constructive service was denied validity. The question of domicile was not referred to, but decision was had on the ground there was no jurisdiction over the person of the defendant. Howe says of this decision:

"* * * Because domicil seems to have become an all important issue in such questions nowadays it does not follow that it was believed to be of equal importance in 1818. The earlier New York cases already discussed would seem to indicate that jurisdiction over the subject-matter of divorce might exist in some other state than that of the domicil. And if the New York courts, at the beginning of the last century, did not insist upon domicil, it is, of course, not strange that they held to the requirement that the defendant be personally brought into court by traditional common law methods." (p. 386, 40 Col.L.Rev.)

It is also notable that the classic pronouncement of the domiciliary requirement made by Story, Conflict of Laws (1841 Ed.) § 230(a) that:

"the doctrine now firmly established in America upon the subject of divorce is that the law of the place of the actual bona fide domicil of the parties gives jurisdiction to the proper courts to decree a divorce for any cause, allowed by the local law without any reference to the law of the place of the original marriage, or the place where the offense, for which the divorce is allowed, was committed."

was qualified in 1865 by the addition:

"that it be not extended beyond transactions occurring while the parties had a fixed and permanent domicil within that forum." (Story, id. (6th Ed. 1865), § 230(b).)

Howe states of this circumstance:

"* * * All that he (Story) may have meant was that the only state

which has jurisdiction to award a valid divorce is the state in which the parties were domiciled at the time when the wrongful acts were done, and that that state may award a divorce in accordance with its own laws even if the acts complained of occurred outside the borders of that state. Because the parties were domiciled in the state its courts had power to punish the commission of acts done by its domiciliaries elsewhere." (pp. 392, 393, 40 Col.L. Rev.)

This interpretation of Story's statement is further bolstered by the fact the principal authority given for the 1841 Statement was Dorsey v. Dorsey, 1838, 7 Watts, Pa., 349, which Howe asserts is the leading American case to adopt the penal theory of jurisdiction. Yet it has been asserted the status theory gained such wide acceptance as it enjoys today under the "influence of the creative scholarship of a distinguished writer (Story)," by Hastie, dissenting justice, Alton v. Alton, 3 Cir., 1953, 207 F.2d 667, 681, citing Cook, "Is Haddock v. Haddock Overruled?", 18 Ind. L.J. 165 (1943). At any rate, it is easy to see a pressing reason for the adoption of the status theory in two early cases set forth by Howe where the validity of divorce decrees was sustained against libelees not personally subjected to the jurisdiction of the court granting the divorces. Harding v. Alden, 1832, 9 Me. 140

and Ditson v. Ditson, 1856, 4 R.I. 87. Until these cases were decided, it was probably thought the only instances when constructive notice was valid was when the libelee was domiciled within the state, so that domicile of the parties was theretofore considered significant with relation to jurisdiction over the *person* rather than over the subject matter.

It is unnecessary to become involved with the mass of litigation in New York and elsewhere after the status theory began to thrive, or to explore the retrenchments it underwent, except to note that the Gould and Glaser cases from New York, supra, where divorces granted in jurisdictions where neither of the spouses were domiciled were upheld, stand as modern enigmas, as do some of the recent United States Supreme Court cases, for example, Cook v. Cook, 1951, 342 U.S. 126, 72 S.Ct. 157, 96 L.Ed. 146, which will be discussed hereafter, unless understood as reflecting the still continuing conflict as to what is the ultimate nature of a decree of divorce.

It has already been shown the status theory revolved about the idea the state of domicile of the spouses has jurisdiction of the marriage res. While there was not unanimity of opinion as to whether the domicile of one spouse alone who wrongfully left the matrimonial domicile was sufficient basis for external validity of a divorce decree, the matter was temporarily

set at rest in Haddock v. Haddock, 1906, 201 U.S. 562, 26 S.Ct. 525, 50 L.Ed. 867, by decision tying jurisdiction to the courts of the state of the "matrimonial domicile." There a wife, resident of New York, brought action there against her husband for separation from bed and board and for alimony, alleging the parties, then both New York residents, had been married in New York; that immediately after the marriage the husband abandoned the wife. In his answer the husband set forth, among other things, a divorce decree from the state of Connecticut. At the trial the judgment roll from Connecticut was excluded from evidence upon the ground Connecticut did not have jurisdiction over the person of the wife, service upon her being merely constructive, and upon the further ground the cause for divorce was false. The federal question was whether the New York court violated the Constitution in refusing to give the Connecticut decree the faith and credit to which it was entitled.

After a very lengthy discussion as to whether a divorce is entitled to obligatory recognition when founded on the domicile of one spouse and constructive service upon the other, the court said:

"Without questioning the power of the state of Connecticut to enforce within its own borders the decree of divorce which is here in issue, and without intimating a doubt as to the power of the state of New York to give to a decree of that character rendered in Connecticut, within the borders of the state of New York and as to its own citizens, such efficacy as it may be entitled to in view of the public policy of that state, we hold that the decree of the court of Connecticut rendered under the circumstances stated was not entitled to obligatory enforcement in the state of New York by virtue of the full faith and credit clause. * * *" 201 U.S. at pages 605, 606, 26 S.Ct. at page 542.

For present purposes it suffices to state that the reasoning of the Haddock case proceeded on the basis of Maynard v. Hill, supra, that a state has power to absolve its citizens of a marriage tie, but the full faith and credit clause could not be used to deny the same power over marriage to another state over its citizens. The status theory was then restricted to the marriage and the res solidly located at the last domicile of the marriage—not with one or the other of the spouses—so far as extraterritorial validity was concerned.

Probably the conflicting theories of the nature of divorce, sometimes submerged, sometimes emerging, are nowhere more in torment than in the majority and dissenting opinions in the Haddock case, and it is the author's view, as asserted in Justice Holmes' dissent in other language, that

the majority opinion incorporated the reverse side of the penal theory of divorce, that a guilty spouse should not be able to flee the state of matrimonial domicile and secure a decree of divorce elsewhere, by rejecting the more clearly "status" decision in Atherton v. Atherton, 1901, 181 U.S. 155, 21 S.Ct. 544, 45 L.Ed. 794, that a Kentucky court could grant a divorce of binding extra-territorial effect to a husband deserted there by his wife, upon constructive service. It seems the difficulty was that in the Atherton case the penal and status theories both led to the same result, while in the Haddock case they diverged to different conclusions.

In the first Williams decision, supra, the Haddock case was expressly overruled, and its holding has been set forth above.

It is supposed the Williams decisions stand as the law today as to extra-territorial validity of divorces, except insofar as the force of the second Williams decision has been eroded by Cook v. Cook, supra. In that case, shortly after a marriage ceremony the respondent (husband) learned the petitioner (wife) was the lawful wife of one Mann. It was agreed the petitioner would go to Florida from Vermont where the parties were living, and there obtain a divorce from Mann. The plan was executed and after petitioner had obtained the divorce she returned to Ver-

mont where she and the respondent went through a second marriage ceremony. Thereafter marital difficulties arose between them and in Hawaii the wife secured a decree of separation and maintenance. Then the husband brought action in Vermont to have the marriages declared null and void. Annulment was granted on the basis the wife had deceived the Florida courts respecting her domicile in Florida, the Florida law requiring that she have an intention to live and remain in Florida.

Because the decision reversing the annulments shows in succinct manner the development in the cases since the second Williams decision, part of it will be quoted here. Speaking of the failure of the record before the court to reflect what part Mann took in the Florida proceedings, it was said [342 U.S. 126, 72 S.Ct. 159]:

"* * * If the defendant spouse appeared in the Florida proceedings and contested the issue of the wife's domicile, Sherrer v. Sherrer, 334 U.S. 343, 68 S.Ct. 1087, 1097, 92 L.Ed. 1429, or appeared and admitted her. Florida domicile, Coe v. Coe, 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451, or was personally served in the divorce state, Johnson v. Muelberger, 340 U.S. 581, 587, 71 S.Ct. 474, 477, 95 L.Ed. 552, he would be barred from attacking the decree collaterally; and so would a stranger to the Florida proceedings, such as

respondent, * * *. On the other hand, if the defendant spouse had neither appeared nor been served in Florida, the Vermont court, under the ruling in Williams v. State of North Carolina, * * * could reopen the issue of domicile."

The Supreme Court concluded by saying until it was known what happened in Florida, Vermont could not relitigate the issue of domicile.

The cases after the Williams decisions, but prior to the Cook decision are fully described in Griswold, "Divorce Jurisdiction and Recognition of Divorce Decrees—A Comparative Study," (1951), 65 Harv.L. Rev. 193, pp. 208–217.

In a case note in 52 Col.L.Rev. 282, the statement is made the cases of Johnson v. Muelberger, 1951, 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552, and Cook v. Cook, supra, can be explained if personal jurisdiction over both parties is accepted as an independent jurisdictional basis for a divorce decree.

It is for the writer impossible to reconcile these decisions with the statements in the second Williams decision to the effect domicile of at least one of the parties to the divorce action is the *sine qua non* of jurisdiction in divorce.

What are the significant facts developed by the study of the foregoing decisions?

First, the United States Supreme Court has never had a case before it raising issue whether jurisdiction to grant divorce may be based upon residence as distinct from domicile of one of the spouses, the fact of military station for a prescribed length of time, or any other tie with the forum. This statement is perhaps subject to qualification by the case of Maynard v. Hill, supra, where as noted earlier the decision speaks in terms of residence rather than domicile; however, it is probably true under the facts of that case that residence and domicile of the husband coincided in Oregon, the state granting the divorce. It should also be noted that Alton v. Alton, supra, arose under a statute of the Virgin Islands providing alternative methods of jurisdiction in divorce, the second of which was founded upon personal service upon both parties. However, the action for divorce in that case proceeded under the first alternative, and although the decision of the Circuit Court affirming the refusal of divorce dealt with the second alternative, it did not seem to be raised. In any case, the decision was vacated by the United States Supreme Court on the ground it was moot, per curiam decision, June 1, 1954, 347 U.S. 610, 74 S.Ct. 736, the husband in that case having secured a divorce in Connecticut following submission of the case to the United States Supreme Court.

Second, it has never been ruled by the United States Supreme Court that a divorce

decree granted to a non-domiciliary in a state requiring domicile of one of the spouses for jurisdiction has no validity in the granting state.

Third, it appears that personal jurisdiction over non-domiciliaries is alone a sufficient basis for jurisdiction to grant divorce under the substantive law of the forum and that such decree has extra-territorial force, even under a statute positing domicile as the jurisdictional ground.

There can be no doubt procedural due process has been satisfied in the instant case, both spouses being personally subject to the jurisdiction of the court, and actively litigating the issues of the divorce, though they do not raise the jurisdictional problem being presently discussed. Therefore, it can only be concluded that unless the divorce decree in some way violates the substantive mandates of the due process clause, it is of unquestioned internal validity.

The argument has been advanced that in view of the history of divorce in this country, the framers of our Constitution could hardly have intended the Constitution or its Amendments would cement the requirement of domicile for jurisdiction over the subject matter of divorce into our law, especially when at the time the Constitution was adopted domicile did not enjoy the sanctity attaching to it in these matters today, and in view of the fact creation and dissolution of marriage was a matter left to the states. But the writer is not disposed to make argument the due process clause may not serve as an expanding device to protect fundamental rights and liberties in areas and under practices not existing at the time of the adoption of the Constitution and its Amendments. Therefore, it is not by the historical content of the due process clause that the present enactment should be measured, but rather by its real, though flexible, substantive content.

So measuring the statutory amendment before the court, it is to be seen the legislature has provided one of two things: Either a certain class of persons may secure divorces upon the basis of being militarily stationed in this state for the prescribed length of time, regardless of where their domicile is; or they may acquire domicile for divorce purposes without a showing of *animus manendi* or *revertendi*. The question of the power of our legislature to change the common law definition of domicile is an intriguing one, but it should not serve as a diversion from the real issue: Is the due process clause satisfied by anything less than the common law domicile of one of the spouses as a basis for jurisdiction over the subject matter of divorce.

On the basis of the foregoing, the proposition must be answered in the affirmative.

While one in the military may acquire a common law domicile in this state, Allen v. Allen, supra, where in good faith the fact and intent of domicile are present, it has not escaped the writer's attention that a domicile here may likewise be fabricated by a showing of mere fragmentary attempts to enter. into the patterns of local community life; or that the acquisition of a bona fide domicile may not be recognized due to the inability of some of the military to provide the same fragmentary evidence of their true intention. But, both those in the military who hold New Mexico as their domicile, and those who do not, have a connection with this state by virtue of their assignment here which may last for years. I believe his state has far greater concern with their marriages than the state of technical domicile where they may not, and in many cases have not, resided for long periods of time. It cannot be doubted that in a great proportion of instances the causes for divorce will have arisen in this state, and it is here the witnesses will be. If conflict and disharmony arise between the spouses, it is this state and its society which will be directly affected, not the state of common law domicile, where domicile is not here. Furthermore, it cannot be supposed, much less presumed, the military forces of this country will indulge any of its personnel with an assignment to station here for a twelve month period in order that they may avail themselves of our divorce provisions.

The ties existing between these people and this state are real and not illusory. The requirement they must meet before action for divorce is brought, of being continuously stationed here for twelve months is real and provable—not subject to the doubt and abuse of the requirement of domicile. It is an honest requirement—for the parties, for the courts.

That domicile is not the exclusive jurisdictional basis for divorce has been recognized in the late case of David-Zieseniss v. Zieseniss, 205 Misc. 836, 129 N.Y.S.2d 649, which holds constitutional a New York statute giving the courts of that state jurisdiction to dissolve marriages solely upon the basis the parties were married within that state. The motion of the defendant to dismiss the complaint was denied, although the complaint did not allege either party was at the time a resident of New York.

As to the effect externally of divorces granted under this provision, I cannot believe our decrees will be nearly so subject to attack as those involved in' Johnson v. Muelberger, supra, and Cook v. Cook, supra, which were given obligatory force abroad; and I steadfastly believe the courts of our sister states will view our decrees with the same sincerity and realism sought to be brought to this analysis, and will accord to our decrees full faith and credit.